

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ULYSSES CHARLES SNEED,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:   5:16-cv-1442-AKK** |
| | ) | |
| **TERRY RAYBON, Warden of** | ) | |
| **Holman Correctional Facility,[1]** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Ulysses Charles Sneed has petitioned for a writ of habeas corpus under Title

28 U.S.C. § 2254. *See generally* doc. 1.[2] Sneed challenges the constitutionality of

---

[1]As a housekeeping matter and as the case caption reflects, a party substitution is appropriate in this habeas action. Specifically, the Supreme Court clarified in *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004), that "the proper respondent [in a habeas action] is the warden of the facility where the prisoner is being held." Sneed is a death row inmate at Holman Correctional Facility where the current warden is Terry Raybon. *See* http://www.doc.state.al.us/facility?loc=33 (last visited July 15, 2022). Consequently, the court **DIRECTS** the clerk to substitute Terry Raybon, Warden of Holman Correctional Facility, for Jefferson S. Dunn—the former—and John Hamm—the current— Commissioner of the Alabama Department of Corrections, as Respondent.

[2]"Doc. ___" refers to the number assigned to each document filed in the court's electronic case filing system. The underlying state court documents are part of the habeas electronic record. Docs. 26; 27. Respondent manually filed "a copy of the surveillance exhibit on a CD . . . . because the electronic file size exceeds the limit for uploading documents via ECF." Doc. 33 at 1. The court has reviewed the manually filed footage of the robbery-murder. Docs. 32; 33.

his 2006 capital conviction and death sentence in the Circuit Court of Morgan County, Alabama, for the murder of a convenience store clerk, Clarence Nugene Terry, during a robbery. The jury found that Sneed was an intentional accomplice in the robbery-murder even though Sneed did not shoot Mr. Terry. The jury recommended in a 7 to 5 vote that Sneed receive a life sentence. The sentencing judge overrode that recommendation and sentenced Sneed to death. After careful consideration, the court finds that Sneed's petition is due to be denied.

## I.

Before turning to the § 2254 analysis, the court provides some background information and reviews some fundamental habeas principles.

## A.

Sneed has had two capital murder trials which ended in convictions and death sentences. Procedurally, as summarized by the ACCA as part of Sneed's second direct appeal:[3]

> Sneed[] was indicted for the capital offense of robbery-murder for the 1993 killing of Clarence Nugene Terry. *See* § 13A–5–40(a)(2), Ala. Code 1975. In 1995, he was tried with codefendant John Hardy, convicted of capital murder, and sentenced to death. [The ACCA] affirmed his conviction and death sentence, *see Sneed v. State*, 783 So. 2d 841 (Ala. Crim. App.1999), but the Alabama Supreme Court reversed

---

[3]"ACCA," which the court uses throughout this opinion, refers to the Alabama Court of Criminal Appeals.

his conviction based on the erroneous admission of a redacted statement he had made to law enforcement authorities that implied that he was the sole individual involved in the shooting. *See Ex parte Sneed*, 783 So. 2d 863 (Ala. 2000).

In 2006, [Sneed] was tried a second time and convicted of the capital offense of robbery-murder. After a sentencing hearing, by a vote of 7 to 5, the jury recommended that he be sentenced to imprisonment for life without the possibility of parole. The trial court overrode the jury's recommendation and sentenced [Sneed] to death. This appeal followed.

*Sneed v. State (Sneed Direct II)*, 1 So. 3d 104, 112 (Ala. Crim. App. 2007) (footnote omitted).

## B.

According to the ACCA,

The evidence showed that, in the early morning hours of September 7, 1993, [Sneed] and Hardy entered Bud's Convenience Store in Decatur; shot and killed the clerk, Clarence Nugene Terry; and stole one of the store's cash registers. An autopsy revealed that the victim suffered seven gunshot wounds—two shots to his left cheek, one shot to his forehead, one shot to his left ear, one shot to his left eye socket, one shot to his chest, and one shot to his right hand.

Several days before the robbery-murder [Sneed] and Christopher Hines drove from Louisville, Kentucky, in Hines' vehicle to visit some of Hines' relatives in Tanner. Sometime after they arrived, they met John Hardy.

On the evening of September 6, 1993, [Sneed] and Hardy were driving around in Hines' vehicle and were drinking and smoking marijuana. Hardy suggested that they "get some money," and they drove by different convenience stores trying to locate a potential target. [Sneed] suggested that Bud's Convenience Store might be a good target because

only one clerk was working in the store. They drove around the store a few times and parked on the side. Before going into the store, Hardy tore off the sleeves of his shirt and they tied a sleeve around the bottom half of their faces. The sleeves did not disguise their identities.

The entire robbery-murder was recorded on videotape and played for the jury. The tape shows that [Sneed] and Hardy entered the store with Hardy pointing a rifle and apparently shooting at the victim. The victim ran behind the counter and tried to hide, but Hardy leaned over the counter and shot him. At the same time, [Sneed] crawled under the counter and tried to open the two cash registers that were on the counter. As the victim crouched in a ball on the floor behind the counter, Hardy then walked around the counter, pointed the rifle at his head, and shot him in the head repeatedly. While this was happening, [Sneed] tried unsuccessfully to open both of the cash registers. At one point, [Sneed] stepped over the victim's body and moved his legs out of the way to have better access to one of the cash registers. Finally, Hardy unplugged one of the registers, and [Sneed] carried it out of the store.

After they left the store, [Sneed] and Hardy went to Tanner to hide the cash register. The next morning, [Sneed], Hardy, and Hines retrieved $48 from the cash register. The manager at Bud's testified that the register that was taken had very little money in it because it was a [backup] register that had not been used on the day of the robbery-murder. After using the money to buy alcohol and gasoline, [Sneed], Hardy, and Hines returned to Louisville, Kentucky.

The investigation led law enforcement authorities to Kentucky, where they discovered Hines' vehicle, which [Sneed] and Hardy had used in the robbery-murder. [Sneed] was arrested in Kentucky and was questioned by Lieutenant Dwight Hale and Sergeant John Boyd of the Decatur Police Department. After being confronted with the videotape of the robbery-murder, [Sneed] admitted his involvement in the robbery.

[Sneed] testified in his own defense and admitted that he assisted in the robbery. However, he stated that he did not know that Hardy was going to shoot and kill the victim. Specifically, he testified:

4

> We went in to rob. I did not intend for nobody to get killed
> or get hurt. That wasn't part of the plan. That wasn't part
> of the plan. We discussed robbing. That is all we did.

*Sneed Direct II*, 1 So. 3d at 112-13 (footnote and internal quotation marks omitted).

## C.

Because many of Sneed's habeas claims challenge the effectiveness of his trial counsel's penalty-phase representation, it is imperative for the court to provide a breakdown of the sentencing order, including the reasons for the override decision, as additional background. *See* doc. 1 at 126-40.

## 1.

In overriding the jury's 7 to 5 recommended life sentence, doc. 26-3 at 16, the circuit court determined that the State had proven two aggravating factors beyond a reasonable doubt, doc. 1 at 131-33. One admitted aggravating circumstance—tied to the jury's guilt-phase conviction—was that Sneed "committed the capital offense while he and his accomplice were . . . robb[ing] . . . Bud's Convenience Store." Doc. 1 at 131-32. The second aggravating finding was that "the capital offense was especially heinous, atrocious or cruel compared to other capital offenses"—the so-called HAC factor. Doc. 1 at 132; Ala. Code § 13A-5-49(8).

Under the sentencing court's HAC analysis, the capital offense "was a conscienceless and pitiless crime and . . . unnecessarily tortuous to the victim." Doc. 1 at 133. Referencing the video evidence, the circuit court noted that Hardy began shooting as he and Sneed "first entered the store." *Id.* The sentencing court pointed out that the videotape captured Mr. Terry's awareness of the lethal danger and his efforts to protect himself, including running "behind the counter[,] trying to hide[,] and roll[ing] [his body] into a ball." *Id.* The circuit court observed that Sneed "never attempted to stop Hardy even as Hardy leaned over the counter and shot Mr. Terry in the chest." *Id.*

The sentencing court described Mr. Terry as an "unarmed and helpless [victim, who was lying] behind the counter on the floor immediately to the left of [Sneed]'s feet[,] while [Sneed] tried to open the cash registers." *Id.* The court noted that Sneed "never stopped trying to open the cash registers while Hardy was shooting Mr. Terry in the head" and remarked that Sneed "looked unfazed" by the murder in the security footage. *Id.* The court pointed out also that Sneed "kicked Mr. Terry's foot out of the way . . . to gain easier access to the second cash register." *Id.*

After summarizing the security footage, the court rejected as "false" Sneed's "claims that he did not intend anyone to die and did not know that Hardy was going to shoot anybody." *Id.* The sentencing court added that "even though [Sneed] [had]

not personally commit[ted] . . . murder," the jury had determined that he "had the specific, particularized intent that [Mr.] Terry be killed during the course of the robbery." *Id.*

## 2.

Moving to mitigation and applying a preponderance of the evidence standard, the court found three statutory circumstances: Sneed's lack of a significant criminal history, his nontriggerman participation, and his age of twenty-three at the time of the offense. Doc. 1 at 134-37 ¶¶ 1, 4, 7. The court gave "very little weight" to the last two of these mitigating findings. *Id.* at 136-37 ¶¶ 4, 7.

Also, the court rejected two statutory mitigators that are relevant to Sneed's habeas petition. The first is related to Dr. Marianne Rosenzweig, a forensic and clinical psychologist, who had "administered psychological tests to [Sneed]" pretrial and prepared a report about those results. Doc. 1 at 134 ¶ 2. Dr. Rosenzweig testified in the penalty phase that Sneed's test "scores indicated . . . [a] 'likel[ihood] . . . of [several] psychological difficulties,'" including anxiety; insecurity with "'fears about past traumas . . . [causing] him [to] behav[e] . . . maladaptive[ly];'" and impulsivity. *Id.* Dr. Rosenzweig concluded that post-traumatic stress and borderline personality disorders were "likely psychological diagnoses for . . . Sneed" but did not confirm the existence of either mental condition fully. *Id.* at 135 ¶ 2. Dr. Rosenzweig testified

also that Sneed "was not mentally retarded and that he was at least [in] the average range of intelligence or above." *Id.* The sentencing court mentioned that "[p]erhaps the trauma experienced by [Sneed] included his participation in the murder of Mr. Terry" and concluded that the "extreme mental or emotional" factor did not exist. *Id.* And the court found that Dr. Rosenzweig's testimony did not establish that Sneed "was under the influence of extreme mental or emotional disturbance" at the time of the offense under Ala. Code § 13A-5-51(2). Doc. 1 at 134 ¶ 2.

Second, the circuit court rejected Sneed's claim under Ala. Code § 13A-5-51(6) that he had a diminished mental capacity from "using alcohol and smoking marijuana laced with cocaine prior to the murder." Doc. 1 at 136 ¶ 6. As evidence rebutting this statutory mitigator, the court noted that Sneed's statement to the police contained no mention of pre-offense drug use. *Id.* And referencing the videotape, the court found that Sneed "was cognizant and appeared to be in full control of his physical and mental faculties." *Id.*

**3.**

Turning to non-statutory mitigation, the sentencing court found six non-statutory circumstances. The court concluded that testimony from Joanne Terrell, a clinical social worker, supported five mitigating categories. *Id.* at 137-38 ¶ 2. Ms. Terrell had completed a psychosocial assessment of Sneed pretrial based upon

"police reports, educational and medical records, [as well as] interviews with [Sneed]" and his family members. *Id.* at 137 ¶ 2.

   As summarized by the court, Ms. Terrell testified in mitigation that Sneed had experienced and witnessed "significant abuse" before reaching adulthood. *Id.* Sneed's father abused him and his mother, a man in the neighborhood raped Sneed at the age of nine, and two of his mother's boyfriends abused him from age eleven into his teenage years. *Id.* at 137-38 ¶ 2. Ms. Terrell testified that after experiencing behavioral problems at home and in school, Sneed had two weeks of emotional treatment at age twelve. *Id.* at 137 ¶ 2. Sneed visited a psychologist one month later and received a diagnosis of dysthymic disorder—a chronic form of depression. *Id.* Sneed spent time at a residential treatment center "for troubled youth" because of his behavioral and mood problems. *Id.* at 137-38 ¶ 2. Sneed "transferred to reform school from th[at] clinic." *Id.* at 138 ¶ 2. As a form of self-medication, Sneed began drinking alcohol and smoking marijuana when he was twelve years old. *Id.* Based on these incidents, Ms. Terrell opined that Sneed's "abus[ive] and trauma[tic] experience[s] . . . caused [him to have] personality deficits" and an inability to "cope with stress." *Id.*

   After considering Ms. Terrell's testimony and her psychosocial assessment of Sneed, the sentencing court determined that the following non-statutory mitigators

9

existed: One, Sneed had experienced a violent, traumatic, and physically-abusive childhood. *Id.* Two, Sneed had "witnessed severe and pervasive domestic violence of his mother." *Id.* Three, Sneed had been "raped at a young age by a virtual stranger." *Id.* Four, beginning at an early age and continuing into his twenties, Sneed had "attempted to self-medicate the damage these traumas caused . . . by . . . abus[ing] . . . drugs and alcohol." *Id.* The circuit court added that Sneed's "emotional damage" "appear[ed]" to be "resistant to mental health treatment." *Id.* And five, Sneed had exacerbated "[h]is emotional problems" with drugs and alcohol, which "led him to a life of petty crime and general instability." *Id.* The court gave these non-statutory factors "little weight in considering the appropriate sentence to impose." *Id.*

The last non-statutory factor which the court credited in favor of Sneed was the jury's recommended life sentence. *Id.* at 138-39 ¶ 3. The court gave that circumstance "moderate weight" because the jury's "vot[ing] was almost equally split." *Id.* at 139 ¶ 3.

### 4.

In balancing the sentencing factors, the court recognized that the nine mitigating circumstances outnumbered the two in aggravation. *Id.* at 139. But the court concluded that "the seriousness of the first aggravating circumstance and the

heinousness and cruelness of the second outweigh[ed] the mitigating circumstances." *Id.*

The court followed that conclusion with its reasoning for the override decision. *Id.* at 139. The court noted that Sneed had "purposefully chosen" Bud's Convenience Store because "only one person was working" there. *Id.* The court revisited portions of its earlier HAC analysis, including that Mr. Terry "was unarmed[,] . . . defenseless," and "gunned down without any reason" "by masked intruders." *Id.* The court added that it could "only imagine the terror" which Mr. Terry must have "felt as he dove behind the counter trying to escape." *Id.* The court discussed Sneed's involvement in the capital crime as reflected in the videotape and the jury's guilt-phase finding that he "had a particularized intent to kill even though he was not the triggerman." *Id.* at 139-40. The court expressed disbelief in Sneed's testimony and determined, to the contrary, that "all the evidence" showed that Sneed "did nothing to stop Hardy because [Sneed] did not want to stop the killing." *Id.* at 140. The court noted that Sneed "wanted the money in the cash register[] and that was all he focused on while in the store." *Id.* The court added that Sneed's "unfortunate upbringing and experiences" did not "excuse[] . . . his total lack of regard for the life of Mr. Terry." *Id.* The court concluded that Sneed's death sentence "[wa]s not disproportionate or excessive when compared to penalties imposed in similar cases." *Id.*

11

**D.**

Sneed challenged his second conviction and death sentence unsuccessfully on direct appeal to the ACCA. *See Sneed Direct II*, 1 So. 3d at 145. The Alabama Supreme Court and the United States Supreme Court denied Sneed's petitions for a writ of certiorari. *Sneed Direct II*, 1 So. 3d at 104; Doc. 26-13 at 138.

Sneed did not prevail on postconviction review under Alabama Criminal Procedure Rule 32 either. After Sneed amended his Rule 32 petition twice, the circuit court summarily dismissed his collateral allegations without an evidentiary hearing. Doc. 26-16 at 142-65. Sneed appealed, and the ACCA affirmed. Doc. 26-19 at 70-106. Again, the Alabama Supreme Court and the United States Supreme Court denied Sneed's petitions for a writ of certiorari. Doc. 26-20 at 166; Doc. 26-21 at 148. Sneed now seeks federal habeas relief, doc. 1, and his petition is fully briefed, docs. 24; 31.

**II.**

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true for habeas review of a state court conviction pursuant to 28 U.S.C. § 2254 because "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Brecht*, 507 U.S. at 633 (internal quotation

marks omitted) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983), *superseded by statute on other grounds as recognized in Slack v. McDaniel*, 529 U.S. 473 (2000)). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977), *and abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991), *holding modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). "Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (internal quotation marks omitted).

### A.

Consistent with these finality and comity principles, Congress amended the preexisting habeas law under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA governs this court's review of Sneed's habeas claims. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996). When a petitioner has obtained a state-court adjudication of a constitutional claim on the merits and AEDPA applies, additional significant restrictions apply to the federal

court. In particular, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks omitted) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). To grant habeas relief on an adjudicated claim under AEDPA, this court must find not only that the petitioner relies on a meritorious constitutional violation but also that the state court's resolution falls within an exception to § 2254(d). *See* 28 U.S.C. § 2254(d) (providing that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in [s]tate court proceedings unless" an exception applies).

Under (d)(1), a petitioner opens the door to habeas relief if he demonstrates that a state court rejected the merits of a constitutional claim in a manner "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under (d)(2), the petitioner must show that a denial of constitutional relief "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court." 28 U.S.C. § 2254(d)(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Periodically in this opinion, the court uses "clearly-established

constitutional error," "clearly-established AEDPA error," or "AEDPA (d)(1) error" to describe § 2254(d)(1)'s clauses collectively.

The petitioner bears the burden of showing that an adjudicated issue falls within § 2254(d)(1) or (d)(2). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a constitutional holding] incorrectly." *Id.* at 24-25. Additionally, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. __, 138 S. Ct. 1188, 1192 (2018) (holding that habeas courts reviewing adjudicated claims under AEDPA "should 'look through' [an] unexplained decision to the last [developed] state-court decision . . . . [and] then presume that the unexplained decision adopted the same [merits-based] reasoning").

Delving deeper into the limited exceptions to § 2254(d)'s overriding habeas bar, "clearly established Federal law" under (d)(1) encompasses Supreme Court decisions that predate "the last adjudication of [a federal claim's] merits in state court." *Greene v. Fisher*, 565 U.S. 34, 36, 40 (2011) (internal quotation marks omitted). Stated differently, "§ 2254(d)(1) requires federal courts to focu[s] on what

a state court knew and did, and to measure state-court decisions against th[e] Court's precedents *as of the time the state court renders its decision*." *Id.* at 38 (first alteration and emphasis in *Greene*) (last alteration added) (internal quotation marks omitted). Additionally, the statutory term "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion with respect to part II).

## 1.

"[T]he 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006). "A state court's decision is contrary to . . . clearly established precedents [of the Supreme Court] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). But as the Eleventh Circuit has noted, the Supreme Court has not limited the construction of AEDPA's "contrary to" clause to those two examples. Instead, the statutory language "simply implies that the state court's decision must be substantially different from the relevant precedent of

[the Supreme] Court." *Alderman*, 468 F.3d at 791 (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 405).

## 2.

As for (d)(1)'s second clause, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). AEDPA requires this court to give a state court "a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Id.* Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (emphasis in original) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 410).

If a state court denies a federal claim as meritless and "'fairminded jurists could disagree' on the correctness of th[at] . . . decision," then habeas relief under AEDPA's unreasonable application clause is unavailable. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has clarified that a "rule's specificity" must factor into the unreasonableness evaluation. *Richter*, 562 U.S. at 101 (internal quotation marks omitted). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted).

**3.**

Section 2254(d)(2) governs federal court review of state court findings of fact, and "whether a state court errs in determining the facts [under AEDPA] is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342 (2006). Section 2254(d)(2) limits the availability of federal habeas relief due to factual error unless a petitioner is able to show "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

This means that a petitioner may overcome AEDPA's overriding bar against habeas relief by challenging the state court factual findings underlying an adjudicated constitutional claim as unreasonably in conflict with the evidentiary record. *Wood v. Allen*, 558 U.S. 290, 293 (2010). But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301. Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (alteration in *Wood*) (quoting *Rice*, 546 U.S. at 341-42). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding, [a federal] [c]ourt is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (some alterations added) (internal quotation marks omitted) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n. 5 (11th Cir. 2008) (en banc)).

## 4.

Additionally, "a determination of a factual issue made by a [s]tate court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Only with "clear and convincing evidence" may a petitioner overcome a state court's presumptively correct factual findings. *Id.* "Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) (internal quotation marks omitted). The Supreme Court has not addressed the exact relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under §

2254(d)(2).”). And any overlap of AEDPA's factual provisions when considering an adjudicated constitutional claim remains unclear.[4]

As the Supreme Court has commented regarding a petitioner's ability to obtain merits-based habeas review, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

## 5.

Pertinent to Sneed's petition, "AEDPA limits [the] review to whether the state court's determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support a [constitutional] claim . . . was contrary to or an unreasonable application of Supreme Court precedent." *Powell v. Allen*, 602 F.3d 1263, 1273 (11th

---

[4]*Compare Cave v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of (d)(2) and (e)(1), and this case presents no such opportunity."), *with Newland v. Hall*, 527 F.3d 1162, 1183-84 (11th Cir. 2008) (explaining that the "review of a state court's findings of fact-to ascertain whether the court's decision was based on an unreasonable determination of facts-is circumscribed by both section 2254(d)(2) and 28 U.S.C. § 2254(e)(1)").

Cir. 2010) (per curiam). Consequently, a summary dismissal of an inadequately-stated Alabama collateral claim is due deferential treatment under AEDPA. *Id.*; *see also id.* ("review[ing] the Rule 32 court's rejection of [the petitioner's constitutional] claim [under Ala. R. Crim. P. 32.6] as a holding on the merits").

### 6.

In his petition, Sneed pleads, in part, claims of alleged ineffective assistance by his trial counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel. To prove that a conviction or sentence is unconstitutional due to ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance—"a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.* Therefore, "the court need not address

the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

**a.**

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Under the *Strickland* framework, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The Court observed that "countless ways [of] . . . effective assistance [exist] in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* The Court cautioned that "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or [an] adverse sentence, and it is all too easy

for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Consequently, an evaluating court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see, e.g.*, *Newland*, 527 F.3d at 1184 ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689). Simply put, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell "within the wide range of competent assistance." *Chandler*, 218 F.3d at 1315, 1317.

Further, when assessing an adjudicated ineffective assistance claim on habeas review, "it is important to keep in mind that [i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference" on an adjudicated claim. *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (alteration in *Williams*) (internal quotation marks omitted) (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)). "Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the [s]tate court applied *Strickland* to the facts of his case in an *objectively unreasonable*

*manner.*" *Williams*, 598 F.3d at 789 (first alteration added) (internal quotation marks omitted) (first quoting *Blankenship v. Hall*, 542 F.3d 1253, 1271 (11th Cir. 2008) (emphasis added in *Blankenship*); and then quoting *Rutherford*, 385 F.3d at 1309). Because *Strickland* and § 2254(d) incorporate "'highly deferential' [standards], . . . when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The focus of this doubly deferential inquiry "is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" as opposed to "whether counsel's actions were reasonable." *Id.*; *see also id.* at 101 (contrasting "whether the state court's application of the *Strickland* standard was unreasonable" under § 2254(d)(1) with "whether defense counsel's performance fell below *Strickland*'s standard" under the Sixth Amendment). Accordingly, this "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (alteration added) (internal quotation marks omitted).

### b.

The burden of proof for the prejudice prong is less demanding than the performance prong's preponderance of the evidence standard. 466 U.S. at 694. To

24

satisfy the prejudice component, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is [one] sufficient to undermine confidence in the outcome." *Id.* Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). But the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. "[W]hen a [capital] petitioner challenges a death sentence, 'the [constitutional] question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Fla. Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (alterations added) (quoting *Strickland*, 466 U.S. at 695). If the state court has adjudicated the prejudice prong, then a petitioner must demonstrate that the merits-based conclusion contains AEDPA error; otherwise, habeas relief is unavailable. *See Cullen*, 563 U.S. at 197-98 ("Even if his trial counsel had performed deficiently, [the petitioner] also has failed to show that the [state court] must have unreasonably concluded that [he] was not prejudiced.").

25

Additional principles come into play when a sentencing court overrides a jury's recommended life sentence. For example, the Eleventh Circuit has observed that "[p]rejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation." *Kokal v. Sec'y, Fla. Dep't of Corr.*, 623 F.3d 1331, 1350 (11th Cir. 2010) (alternation added) (internal quotation marks omitted) (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1093 n. 8 (11th Cir. 1987)), *adopted on rehearing sub nom. Harich v. Dugger*, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc), *overruling on other grounds recognized in Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997). In *Kokal*, the Eleventh Circuit referenced the jury's unanimous recommended death sentence in concluding that the Florida Supreme Court's rejection of the petitioner's *Strickland* mitigation claim—based on new evidence of organic brain damage—deserved AEDPA deference. 623 F.3d at 1334, 1350.

Also, "a trial judge's post-hoc statements concerning how additional evidence might have affected [the] [override] ruling are not determinative for purposes of assessing prejudice." *Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008). Rather, "an objective standard that presumes a reasonable decisionmaker" applies when assessing whether collateral evidence creates a reasonable probability of a different sentencing outcome. *Id.* (citing *Strickland*, 466 U.S. at 695).

26

## III.

With these AEDPA principles in mind, the court turns to Sneed's claims, which number 8 in total, Claims A-H, excluding any subclaims. The court divides Sneed's claims into two sections. In section A, the court addresses Sneed's six claims unrelated to trial counsel's effectiveness—Claims E-G, D, A, and H—and the guilt-phase and penalty-phase ineffective assistance claims in section B—Claims C and B. Sneed exhausted some but not all of the claims analyzed in section A on direct review and in section B on collateral review. The court will address the habeas concepts of exhaustion, procedural default, and heightened pleading when those issues arise in a claim. Additionally, within section A, the court combines the analysis of Claims A and H into one section because of the significant overlap in Sneed's allegations.

## A.

## 1.

Sneed alleges in Claim E that his less culpable conduct—as "a nontriggerman"—means that his death sentence is excessive under the Eighth Amendment. Doc. 1 at 106 ¶ 184. Sneed asserts statutorily that AEDPA deference does not preclude habeas relief because of clearly established constitutional and unreasonable factual error in the ACCA's denial of this claim. *See id.* at 112 ¶ 193 (citing 28 U.S.C. § 2254(d)(1)-(d)(2)). The court disagrees.

**a.**

Citing several Supreme Court and Alabama authorities, doc. 26-10 at 89-91, Sneed argued on direct appeal that "a death sentence for a nontriggerman accomplice [wa]s excessive" under the Eighth Amendment. *Sneed Direct II*, 1 So. 3d at 130-31. In framing the constitutional issue, the ACCA explained that under *Enmund v. Florida*, 458 U.S. 782 (1982), a case where the defendant like Sneed was not the trigger person, a death sentence "was disproportionate" for a robbery-murder accomplice who "drove [and remained in] the getaway car." *Sneed Direct II*, 1 So. 3d at 130. The ACCA contrasted this defendant getaway driver's lack of lethal intent or expectations and minor participation in *Enmund* to the nontriggermen's "active[] involve[ment]" in the kidnapping-robbery in *Tison v. Arizona*, 481 U.S. 137 (1987), where the Supreme Court recognized that a "reckless disregard for human life . . . represents a highly culpable mental state . . . that may be . . . [factored] in[to] . . . a capital sentencing judgment when th[e] [nontriggerman's] conduct causes [a] natural, [al]though . . . not inevitable, lethal result." *Sneed Direct II*, 1 So. 3d at 131 (internal quotation marks omitted). The ACCA noted that in *Tison*, "each petitioner was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder[s]." *Id.* (internal quotation marks omitted).

The ACCA followed its discussion of *Enmund* and *Tison* with a collection of affirmed Alabama "death sentences for nontriggerman accomplices." *Sneed Direct II*, 1 So. 3d at 131. Referencing Sneed's "active[] involve[ment] in the robbery-murder and . . . presen[ce]" throughout the offense, the ACCA denied Sneed's Eighth Amendment excessiveness claim. *Sneed Direct II*, 1 So. 3d at 131; *see id.* (concluding that "even though [Sneed] was not the triggerman," the death sentence "for his participation in the robbery-murder of the victim [wa]s not excessive").

**b.**

Similarly, here, Sneed alleges on habeas review that he received a disproportionate sentence under the Eighth Amendment. Doc. 1 at 106, 112 ¶¶ 184, 192. Again, Sneed bases this excessiveness claim on the nontriggerman role he played in the capital offense. *Id.* Sneed argues that the ACCA's analysis is objectively unsound under AEDPA's (d)(1)'s legal standards and (d)(2)'s factual provision.

***i.***

To prove that the ACCA committed clearly established error under (d)(1), Sneed relies upon *Enmund*, *Tison*, *Roper v. Simmons*, 543 U.S. 551 (2003), and several non-binding authorities. Doc. 1 at 106-07, 109 ¶¶ 184-85, 188. The excerpts favorable to Sneed from the California and Florida Supreme Court cases which he

cites, *id.* at 109 ¶ 188, are beyond AEDPA's definition of clearly established law. Consequently, the court focuses on the Supreme Court decisions.

Minimally, (d)(1)'s clearly established component requires Sneed to identify Supreme Court authority with a contextual connection to his nontriggerman allegations. This threshold consideration rules out *Roper*, which prohibits capital punishment for juveniles as precedent helpful to Sneed under (d)(1). *Roper*, 543 U.S. at 568. Thus, the court will focus on *Enmund* and *Tison* which involved nontriggermen who challenged their death sentences as excessive.

In *Enmund*, "the record supported no more than the inference that [the petitioner] was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape." 458 U.S. at 788. Under Florida law, nonetheless, the accomplice driver was "a constructive aider and abettor and hence a principal in first-degree murder upon whom the death penalty could be imposed." *Id.* Under this felony-murder construct, the petitioner's nontriggerman role and absence from the murder scene were "irrelevant to . . . challeng[ing] . . . [a] death sentence," and "whether [the petitioner] intended that the [victims] be killed or anticipated that lethal force would or might be used if necessary to effectuate the robbery or a safe escape" did not matter under Florida law. *Id.* The *Enmund* Court "concluded that imposition

of the death penalty in these circumstances [wa]s inconsistent with the Eighth and Fourteenth Amendments." *Id.*

Sneed contends that *Enmund* "categorically exempts [him] from the death penalty because his participation and culpability [we]re too minimal." Doc. 1 at 106 (emphasis omitted). The court disagrees. Sneed's factual and legal circumstances were significantly different than the getaway driver's in *Enmund*. Factually—as the store's video surveillance reflected—Sneed was present throughout the robbery-murder and participated actively in the robbery. *See* doc. 33 (notice of manual filing of "a copy of the surveillance exhibit on a CD per Judge's order"). Thus, Sneed was unlike the getaway driver in *Enmund* who remained isolated from the crime scene.

Legally—as the *Enmund* Court noted after reviewing "the punishment at issue" in other jurisdictions—Alabama approached accomplice liability in a capital case differently than Florida. 458 U.S. at 789. Unlike Florida, an Alabama accomplice could not receive "the death penalty solely for participation in a robbery in which another robber takes [a] life." *Id.* Instead, "to be found guilty of capital murder, [an Alabama] accomplice must have had [the] intent to promote or assist [in] the commission of the offense[,] and [the] murder must [have] be[en] intentional." *Id.* at 790 n. 7 (internal quotation marks omitted) (citing Ala. Code §§ 13A-2-23, 13A-5-40(a)(2), 13A-6-2(a)(1) (1977 and Supp. 1982)); *cf. also* doc. 26-10 at 70 (Sneed's

arguing in *Sneed Direct II* that the State presented insufficient evidence "that he had the specific and particularized intent to kill Mr. Terry" as required under Alabama law).

Consistent with Alabama's format, the trial court instructed the jury on intentional murder as an accomplice and unintentional felony murder, including a charge on intoxication as negating intent, in the guilt phase of Sneed's case. *See* doc. 26-7 at 171-75 (instructing on intentional murder requirements when the capital defendant is a nontriggerman accomplice); *see also id.* at 177 (instruction on intoxication); Doc. 26-3 at 7 (same). After hearing all the evidence, including that Sneed was unarmed, a unanimous jury found, beyond a reasonable doubt, that Sneed had promoted or assisted in the capital offense with "a particularized intent to kill" and convicted him of robbery-murder as an accomplice. Doc. 26-7 at 172; *see also* doc. 26-3 at 15 (reflecting three guilt-phase options on the verdict form and capital murder marked). Following Sneed's capital conviction as an intentional accomplice, his case moved to the penalty phase.

Thus, Sneed's "culpable mental state," 458 U.S. at 789, was relevant to his death sentence in contrast to the unconstitutional format in *Enmund*. And nothing in *Enmund* invalidated, much less clearly so, an accomplice's death sentence under a structure like Alabama's. Consequently, Sneed has not shown with *Enmund* that the

32

ACCA reached a contrary to or unreasonable decision on his excessive punishment claim.

The Supreme Court revisited *Enmund* in *Tison*. The Court considered whether the death penalty was excessive for accomplices who "neither . . . specifically intended to kill the victims . . . [nor] inflicted the fatal gunshot wounds." *Tison*, 481 U.S. at 138. The *Tison* petitioners were brothers who armed their incarcerated father and his cellmate and helped them escape from prison. *Id.* at 139. Several days after the breakout, the group had vehicle problems and "decided to . . . steal a car." *Id.* at 139-40. After getting a vehicle to pullover, the armed group held the four family members from that car captive. *Id.* at 140. Eventually, the petitioners' father and his cellmate "brutally murder[ed] [the victims] with repeated blasts from their shotguns." *Id.* at 141. The petitioners "made [no] effort to help the victims" and "drove away, continuing their flight," until law enforcement eventually apprehended them. *Id.*

The State tried the petitioners for capital murder under Arizona's "accomplice liability and felony-murder statutes" and obtained convictions. *Id.* at 141-42. After weighing the aggravating and mitigating factors, the trial court "sentenced both petitioners to death." *Id.* at 143. The appellate court affirmed. Thereafter, the petitioners "collaterally attacked their death sentences in state postconviction proceedings [and] alleg[ed] that *Enmund* . . . required reversal." *Id.* The Arizona

Supreme Court understood that *Enmund* prohibited capital punishment unless an accomplice had an "intent to kill." *Tison*, 481 U.S. at 143 (internal quotation marks omitted). Still, the Arizona Supreme Court concluded that the brothers' "participation in the events leading up to and following the murder of four [victims]" met that level of intent. *Tison*, 481 U.S. at 138. The *Tison* Court vacated the judgments holding "that the Arizona Supreme Court [had] applied an erroneous standard in making the findings required by *Enmund*." 481 U.S. at 138.

The Supreme Court did "not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty." *Id.* at 158. But the Court clarified that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." 481 U.S. at 158. On the record before it, the Court expressed that "[t]he Arizona courts ha[d] clearly found that the former [requirement] existed . . . and remand[ed] for determination of the latter [requirement]."[5]  *Id.*

Thus, *Tison* establishes that an active but non-shooting accomplice may receive a constitutionally valid death sentence with a mentally culpable state of

---

[5]Despite "stat[ing] the[] two requirements separately," the Court noted that "they often overlap." *Tison*, 481 U.S. at 158 n. 12; *see id.* (explaining that "even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding").

reckless indifference rather than an intent to kill. *See id.* (acknowledging that a "minority of . . . jurisdictions . . . have rejected the possibility of a capital sentence [for felony murder] absent an intent to kill," but determining that such a "position [was not] constitutionally required"). This means that Sneed's pretrial statement and testimony that he had no intent to kill Mr. Terry is not dispositive of his *Enmund*-excessiveness claim. *See Tison*, 481 U.S. at 150 ("accept[ing] . . . as true" the "argu[ment] . . . that the[] [petitioners] did not intend to kill as that concept has been generally understood in the common law") (internal quotation marks omitted); *cf. also* doc. 1 at 113 ¶ 194 (requesting that this court revisit *Tison*'s reckless-indifference holding and preclude Sneed's execution under the Eighth Amendment's evolving standards of decency because he had no intent to kill).

Absent from Sneed's petition is authority which clearly establishes that his continuous presence and substantial participation in the robbery-murder, knowing that Hardy had a firearm, failed to rise to a reckless indifference to Mr. Terry's life. Likewise, Sneed does not argue that Alabama's accomplice liability framework, which incorporates an intentional component, is unconstitutional under *Tison*'s refinement of *Enmund*. Thus, Sneed has not demonstrated that the ACCA's resolution of his excessive penalty claim was contrary to or unreasonable under *Tison*.

*ii.*

Turning to (d)(2), Sneed argues that the ACCA "gloss[ed] over the intent requirement" in denying his excessive penalty claim. Doc. 1 at 110 ¶ 190. To support his position, Sneed focuses on parts of the record which, he contends, substantiate his lack of intent to kill Mr. Terry, noting for example that "I didn't kill anybody. I just took the cash register," and that "[t]he plan . . . [was] to rob[;] . . . . no[t] . . . to kill." *See, e.g.*, *id.* (internal quotation marks omitted). As explained in the (d)(1) analysis, whether Sneed lacked a murderous intent does not resolve the blameworthy inquiry under *Tison*. Instead, Sneed's ability to prove a disproportionate punishment claim turns upon evidence, if any, that he participated minimally and acted without reckless indifference as an accomplice. And relevant here, the ACCA determined that Sneed's active participation in the robbery-murder and presence throughout the offense were sufficient to warrant the death penalty under *Enmund* and *Tison*. Sneed's arguments to the contrary and the evidence which he cites are inapposite because they do not undermine the findings incorporated into the ACCA's decision. Consequently, Sneed has neither demonstrated that the ACCA based the denial of this Eighth Amendment claim on objectively wrong facts under (d)(2) nor overcome those presumptively correct facts with clear and convincing evidence under (e)(1), if applicable.

*iii.*

Sneed argues also that the Alabama Supreme Court's discussion of the video surveillance evidence in *Ex parte Sneed (Sneed ASC Direct I)*, 783 So. 2d 863 (Ala. 2000) (per curiam), establishes that the ACCA committed unreasonable factual error in *Sneed Direct II*. Doc. 1 at 111 ¶ 190. At issue here is the Alabama Supreme Court's comment that the security footage did not "capture Sneed's intent at the time [he] and Hardy entered the store." Doc. 1 at 111 ¶ 190 (internal quotation marks omitted). The comment stemmed from Sneed's appeal of his first trial where the State tried Sneed and Hardy together. *Sneed ASC Direct I*, 783 So. 2d at 865. Over Sneed's objection, the State "used [an] edited and redacted [version of a] statement," which Sneed had made about the robbery-murder. *Id.* Because Sneed's confession implicated Hardy, the State modified the document "to avoid violating Hardy's confrontation right guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution." *Id.*

Sneed argued on appeal that the redacted statement prejudiced his guilt-phase defense that he had no murderous intent and "violated the rule of completeness." *Id.* at 868. The Alabama Supreme Court agreed. In comparing the factual inferences from the unmodified and modified versions of Sneed's confession, *id.* at 865-68, the Court concluded "that the redaction [had] . . . made a liar out of Sneed," *id.* at 869. The

Court identified several "irreconcilabl[e] inconsisten[cies]," which left the jury with an impression that Sneed "[w]as the central figure in the crime." *Id.* These "distort[ions]" included "that Sneed drove the car, obtained the murder weapon, drove past six stations looking for the easiest target, devised the means of making the masks, and induced Hardy to carry the weapon into the store." *Id.*

The Court considered next the completeness rule. Specifically, the Court evaluated whether the videotape made "the meaning of [Sneed's] redacted statement . . . clear despite the [incompleteness]." *Id.* at 869. The intent language, which Sneed seizes upon on habeas review, comes from the application of that evidentiary doctrine. In particular, the Court observed that the security footage "provided a remarkable amount of evidence" about how the offense unfolded—"Sneed . . . [neither] act[ed] alone . . . [nor] was . . . the gunman." *Id.* at 869. But the Court explained that the surveillance tape provided no information about the "events leading up to the murder" and could not "capture Sneed's intent" as he entered the store with Hardy. *Id.*

Given those evidentiary limitations, the Alabama Supreme Court determined that "the videotape . . . d[id] not overcome the distorted statement's contradiction of Sneed's defense that he lacked the specific intent to commit murder." *Id.* Concluding that the admitted redaction had "sacrificed [Sneed's rights] . . . to accommodate the

State's interest in conducting a joint trial" and caused undue prejudice, the Court granted him a new trial. *Id.* at 870-71.

As contextualized above, the videotape's inability "to capture Sneed's intent" pre-offense was an evidentiary determination distinct from the ACCA's assessment of his participation and culpable mental state under the Eighth Amendment. And Sneed has not shown how the Alabama Supreme Court's remark that prejudicial contradictions remained regarding his intent, despite the security footage, means that the ACCA relied upon objectively wrong facts to deny his disproportionate-punishment claim.[6]

### c.

Turning now to Sneed's remaining allegations in Claim E, beyond seeking habeas relief under the Eighth Amendment, Sneed contends that the excessive punishment he received violates his "rights to due process [and] a reliable sentence" under the Fifth, Sixth, and Fourteenth Amendments. Doc. 1 at 112 ¶ 193. Sneed's references to due process and the Fourteenth Amendment are consistent with asserting an Eighth Amendment claim against the State through the incorporation

---

[6]Sneed's allegations about the videotape's evidentiary limitations also do not overcome (e)(1)'s presumptively-correct factual standard on his Eighth Amendment claim.

doctrine.[7]  But like his briefing on direct appeal, doc. 26-10 at 67-77, Sneed asserts

but leaves undeveloped how an alleged excessive death sentence violated his Fifth,

Sixth, or independent Fourteenth Amendment rights, implicating the habeas concepts

of exhaustion, procedural default, and heightened pleading.

### *i.*

"Section 2254(b) requires that prisoners must ordinarily exhaust state remedies

before filing for federal habeas relief." *Cullen v. Pinholster*, 563 U.S. 170, 182

(2011). And "[a]n applicant shall not be deemed to have exhausted the remedies

available [in state court] . . . if he has the right under the law of the State to raise, by

any available procedure, the question presented." 28 U.S.C. § 2254(c). Exhaustion

requires that a petitioner "'give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

appellate review process,' including review by the state's court of last resort, even if

review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th

Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "Alabama's

discretionary direct review procedures bring Alabama [habeas petitioners] within the

---

[7]"With only 'a handful' of exceptions, th[e] [Supreme] Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." *Timbs v. Indiana*, 586 U.S. __, 139 S. Ct. 682, 687 (2019) (quoting *McDonald v. Chicago*, 561 U.S. 742, 765 (2010) (plurality opinion)).

scope of the *Boerckel* rule." *Pruitt*, 348 F.3d at 1359 (internal quotation marks omitted) (quoting *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001)). *Boerckel* applies to Alabama's postconviction appellate review structure too. *See Pruitt*, 348 F.3d at 1359 ("Nothing in *Boerckel*'s reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *id.* (concluding that petitioner had "failed to exhaust his state remedies by not petitioning the Alabama Supreme Court for discretionary review of the denial of his state habeas petition").

The exhaustion requirement is intended to afford the state-court system the first opportunity to correct federal questions concerning the validity of criminal convictions. This means that for habeas review "[t]o be appropriate," the petitioner "must have raised these claims in state court to allow the state courts the opportunity to rule on the federal issues." *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). Additionally, this means that "[f]ederal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (internal quotation marks omitted) (quoting *Barefoot*, 463 U.S. at 887).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state

courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y, Fla. Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)). And "[a] failure to exhaust occurs . . . when a petitioner has not 'fairly present[ed]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Id.* at 1284 (last alteration modified in *Pope*) (quoting *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (per curiam)).

## *ii.*

Linked to the doctrine of exhaustion is procedural default. For example, if a petitioner seeks habeas relief based on a mixture of exhausted and unexhausted federal claims, a district court may dismiss the petition without prejudice, *Rose v. Lundy*, 455 U.S. 509, 519 (1982), or stay the habeas action to allow the petitioner to first avail himself of his state remedies, *see Rhines v. Weber*, 544 U.S. 269, 277-78 (2005) (discussing "[s]tay and abeyance" option for mixed habeas petitions). But "if it is clear from state law that any future attempts at [state court] exhaustion would be

futile" because of the state's procedural framework, then a "federal court[] may treat [that] unexhausted claim[] as procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (citing *Snowden*, 135 F.3d at 737). This habeas doctrine, known as unexhausted procedural default,[8] avoids a game of "needless 'judicial ping-pong'" when a state procedural rule "obvious[ly]" bars a state court from considering the merits of an unexhausted federal claim. *Snowden*, 135 F.3d at 736 (citing *Coleman*, 501 U.S. at 735 n. 1). Unexhausted procedural default includes claims that a petitioner never raised or exhausted only partially in state court.

A second type of procedural default occurs when a petitioner presents his federal claim without following "'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119 (quoting *Wainwright*, 433 U.S. at 87). If the state court relies upon that procedural mistake to dismiss the alleged constitutional violation, then the petitioner "will have 'procedurally defaulted his claim[]' in federal court." *Mason*, 605 F.3d at 1119 (alteration added) (quoting *Boerckel*, 526 U.S. at 848). Under this strain of procedural default, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any

---

[8] *See Bailey*, 172 F.3d at 1305 ("[F]ederal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile.").

subsequent federal habeas review of that claim." *Ward*, 592 F.3d at 1156 (alteration in *Ward*) (internal quotation marks omitted) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). The court refers to this habeas scenario as state-barred procedural default.

****

With these habeas concepts in mind, Sneed's vague mention of rights under the Fifth, Sixth, or free-standing Fourteenth Amendment did not exhaust those theoretical constitutional claims tied to an alleged disproportionate-death sentence in state court. Sneed's similar bare approach to presenting these same allegations on habeas review does not meet the heightened pleading requirement.[9]  Thus, the court denies those parts of Sneed's petition under these other amendments because of unexhausted procedural default and inadequate habeas pleading, development, and proof.

---

[9] Separate from exhausting claims in state court and avoiding procedural default, a heightened pleading rule applies to a petitioner's federal habeas allegations. *See* Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (requiring petitioner to "specify all the grounds for relief[,]" "state the facts supporting each ground[,]" and "state the relief requested"); *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (explaining that habeas Rule 2(c) requires heightened pleading); *Mayle v. Felix*, 545 U.S. 644, 649 (2005) (contrasting that Rule 2(c) "requires a more detailed statement" with Federal Civil Procedure Rule 8(a)(2)'s "short and plain statement of the claim" standard) (internal quotation marks omitted).

In sum, Sneed neither overcomes AEDPA deference nor otherwise substantiates these allegations of an excessive punishment. Thus, the court denies Claim E.

## 2.

In Claim F, which overlaps with Claim E, Sneed asks this court to reevaluate *Tison*'s holding because of evolving standards under the Eighth Amendment. Doc. 1 at 113 ¶ 194. Specifically, Sneed contends that, consistent with changes in the national perspective since *Tison*, the Eighth Amendment should preclude capital punishment for accomplices who did not, or had no intent to, kill. Doc. 1 at 113 ¶ 194. Conceding in reply that he never raised this claim in state court, Sneed argues that the cause and prejudice exception applies. Doc. 31 at 49-51.

### a.

A petitioner, who failed to raise a claim in state court, may overcome the prohibition against habeas review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. To do so, because the standard is conjunctive, a petitioner must establish both components to obtain habeas review. *Coleman*, 501 U.S. at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to pursue the claim properly under state court procedures. *Murray*

*v. Carrier*, 477 U.S. 478, 488 (1986). Appropriate grounds include demonstrating that "interference by officials . . . ma[de] compliance with the State's procedural rule impracticable, . . . showing that the factual or legal basis for a claim was not reasonably available to counsel[,] . . . [or attributing that procedural noncompliance to] . . . constitutionally [i]neffective assistance of counsel." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (some alterations added) (internal quotation marks omitted) (quoting *Carrier*, 477 U.S. at 488), *superseded on other grounds by statute as stated in Banister v. Davis*, 590 U.S. __, 140 S. Ct. 1698, 1707 (2020).

As for the second component, a habeas petitioner must "show . . . actual prejudice resulting from the alleged constitutional violation." *Ward*, 592 F.3d at 1157. This standard means "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to [a petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

**b.**

Sneed's cause contentions revolve around death-penalty developments post-*Tison*. For example, Sneed references a nationwide increase in "proportional sentencing" for accomplices "who lacked an intent to kill" since *Tison*. Doc. 31 at 49. Sneed mentions also the "abolished . . . practice of judicial override" in Alabama,

Delaware, and Florida after the Supreme Court decided *Hurst v. Florida*, 577 U.S. 92 (2016). Doc. 31 at 50. These contentions are unavailing. To begin, Sneed cites no case authority which confirms that these developments provide him with valid cause to excuse his unexhausted procedural default. Moreover, although a petitioner may establish cause when "a constitutional claim is so novel that its legal basis is not reasonably available to counsel," *Reed v. Ross*, 468 U.S. 1, 16 (1984), here, however, Sneed seeks to create constitutional cause in a manner that conflicts with the *Enmund-Tison* framework and this court's role on habeas review. Specifically, Sneed asks this court to: disregard binding Eighth Amendment precedent; prohibit capital punishment for non-shooting accomplices who lacked an intent to kill; and accept that untenable ruling as cause. Lower courts are bound by precedent and a district court cannot ignore binding precedent to generate constitutional cause to excuse procedural default. Therefore, the court declines Sneed's invitation, and finds, based on this record and the case law, that Sneed has not shown cause to overcome his default.

Sneed has also failed to demonstrate prejudice. Meeting the second component requires Sneed to identify a constitutional claim capable of "creat[ing] 'a reasonable probability that the result of [his] [penalty phase] would have been different.'" *Mincey v. Head*, 206 F.3d 1106, 1138 (11th Cir. 2000) (last alteration added) (quoting

47

*Strickler v. Greene*, 527 U.S. 263 (1999)).[10] Sneed again cites "evolving capital sentencing standards, particularly in light of Alabama's prospective repeal of the override statute." Doc. 31 at 50. As Sneed implicitly recognizes by noting the "prospective repeal," Alabama's abolishment of the override provision does not benefit him retroactively. And the federal constitution does not demand that the State broaden the prospective scope of the decision to end that former practice.

Regardless, Sneed's observations about nationwide trends in capital punishment do not establish that he experienced a cognizable constitutional violation, much less, actual prejudice in his sentence. Concrete, rather than, at most, national signs supporting arguably inchoate, constitutional harm forms the bedrock of prejudice. And with only an evolving constitutional theory, Sneed is unable to demonstrate even a possibility, much less a reasonable probability, of a different sentencing outcome. Consequently, Sneed has not shown that he suffered actual prejudice on account of evolving Eighth Amendment standards or Alabama's repeal of judicial override post-*Tison*.

---

[10]The Eleventh Circuit noted in *Mincey* that the *Strickler* Court "end[ed] the debate" over whether the standard for actual prejudice was different than the reasonable probability test for *Strickland* prejudice. *Mincey*, 206 F.3d at 1147 n. 86 (11th Cir. 2000); *see id.* at 1147 ("[T]he prejudice *Strickler* requires to overcome a procedural default is the same as the prejudice *Strickland* requires to demonstrate prejudice (in the ineffective assistance context).").

To close, Sneed's efforts to excuse his procedural default through cause and prejudice fail. Accordingly, the court denies Claim F because of Sneed's unexhausted procedural default.

### 3.

In Claim G, Sneed asserts that the sentencing court violated his constitutional rights in applying Alabama's "especially heinous, atrocious or cruel" or HAC factor as an aggravating circumstance. Doc. 1 at 116 ¶ 200 (internal quotation marks omitted); *id.* at 118-19 ¶ 205. Statutorily, Sneed argues that the state courts' objectively-flawed adjudication of this claim opens the (d)(1) and (d)(2) doors to habeas relief. Doc. 1 at 118-19 ¶ 205.

The court considers the state court history of this claim before undergoing the analysis.

### a.

Sneed argued on direct review in state court that "the trial court erroneously concluded that the murder was especially heinous, atrocious, or cruel compared to other capital murders." *Sneed Direct II*, 1 So. 3d at 116-17; Doc. 26-10 at 36. Citing several Supreme Court decisions, Sneed maintained that "the application and finding of the HAC aggravating circumstance" to support his death sentence was unconstitutional. Doc. 26-10 at 37.

49

Sneed divided this appellate claim into two subclaims. Doc. 26-10 at 37, 42. Relevant to his habeas Claim G, Sneed argued that he should not bear responsibility "for the [p]recise [m]anner in which" Hardy murdered Mr. Terry. Doc. 26-10 at 37 (emphasis omitted); *Sneed Direct II*, 1 So. 3d at 117. Sneed identified two aspects of the penalty phase which he maintained substantiated the merits of this subclaim: erroneous jury instructions and the sentencing court's unlawful reliance on his mental state. *Id.* at 117-18; Doc. 26-10 at 37, 41.

Concerning the instructions, Sneed argued that the trial court's definition of "cruel"—i.e., that the HAC factor's disjunctive "cruel" component applied to offenses "designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others," doc. 26-10 at 37 (internal quotation marks omitted)—violated the principle that "one's mental state is irrelevant to the [HAC] determination," doc. 26-10 at 38. Sneed contended that "the phrases 'designed to' and 'even enjoyment of' necessarily" improperly required the jury to make "some assessment of" his or Hardy's mental state at the time of the murder. *Id.* at 37-38.

Relatedly, Sneed made several alternative arguments about the jury instructions. Sneed noted that without clarifying whose mental state mattered, "the trial court failed to channel the jury's discretion." *Id.* According to Sneed, the "vague[ly]"-worded instruction meant that "some jurors may have considered [his]

mental state relevant while others . . . Hardy's." *Id.* at 39 n. 4. Because the record did not disclose "whether the jury unanimously relied upon the same set of facts in assessing this aggravator," Sneed contended that the factor was "invalid," *id.* at 39, and "should not have been considered in determining [his] sentence," *id.* n. 4.

Sneed added that assuming Hardy's mental state mattered, then the application of the HAC factor "[c]reat[ed] strict liability" for him and "violate[d] the Eighth Amendment's narrowing function." *Id.* at 39-40. Sneed argued too that, alternatively, if his mental state mattered, "no evidence . . . support[ed]" his "personal[] desire[] to inflict a high degree of pain" on Mr. Terry or have Hardy carry out the murder in a certain manner. *Id.* at 40 (internal quotation marks omitted).

In the last section of this subclaim, Sneed focused on the sentencing court's application of the HAC factor. Doc. 26-10 at 41. Sneed maintained that the sentencing court relied erroneously on his mental state to support that aggravating circumstance. *Id.* Sneed argued that the trial court's references to his "particularized intent to kill," failure to intervene on Mr. Terry's behalf, and "unfazed" look during the murder were irrelevant to the HAC assessment. *Id.* at 42.

*i.*

The ACCA began its analysis with Sneed's objection to applying the HAC factor to him vicariously because of Hardy's conduct. The ACCA observed that the

"Alabama appellate courts ha[d] not specifically addressed" vicarious responsibility

for an aggravating circumstance. *Id.* at 117. Still, citing several Alabama cases

involving the HAC factor, the ACCA explained that the "focus[]" of that aggravating

circumstance is "the manner of the killing and not the defendant's actual participation

in the murder." *Id.*; *see, e.g.*, *Ex parte Bankhead*, 585 So. 2d 112, 125 (Ala. 1991)

(similar).

The ACCA turned then to the analysis of a similar sentencing issue in *Owens*

*v. State*, 13 S.W.3d 742 (Tenn. Crim. App. 1999). *Sneed Direct II*, 1 So. 3d at 117.

In *Owens*, the Tennessee Criminal Court of Appeals considered "whether an

aggravating factor [could] be applied vicariously to a defendant if he was not the

actor responsible for the particular aggravating circumstance." *Sneed Direct II*, 1 So.

3d at 117 (internal quotation marks omitted) (quoting *Owens*, 13 S.W.3d at 761). The

*Owens* court observed that no Tennessee court had addressed a vicarious application

of the HAC factor to "a convicted murderer, who took no part in the killing . . . and

was unaware . . . how it was to be accomplished." *Sneed Direct II*, 1 So. 3d at 117

(internal quotation marks omitted) (quoting *Owens*, 13 S.W.3d at 761). The *Owens*

court considered many authorities, including ones from "[o]ther federal and state

courts [which] ha[d] . . . addressed" death sentences based upon a vicarious

application of the HAC factor. *Sneed Direct II*, 1 So. 3d at 117 n. 11 (internal

quotation marks omitted) (quoting *Owens*, 13 S.W.3d at 761 & n. 11). The *Owens* court "conclude[d] that a non-triggerman defendant c[ould] be held vicariously liable for an aggravating circumstance following an *Enmund–Tison* determination" in the guilt phase. *Sneed Direct II*, 1 So. 3d at 117 (internal quotation marks omitted) (quoting *Owens*, 13 S.W.3d at 762).

Agreeing with the outcome in *Owens*, the ACCA "likewise . . . h[e]ld that an accomplice may be held vicariously liable for the manner in which his codefendant commits a murder." *Sneed Direct II*, 1 So. 3d at 118. The ACCA clarified that its vicarious application holding meant that "a court [could] properly apply the . . . [HAC factor] to a nontriggerman" as the sentencer did in Sneed's capital case. *Id.*

## ii.

The ACCA reviewed Sneed's jury-charge contentions for plain error because he raised them "for the first time on appeal." *Id.* The ACCA found no error because the Alabama Supreme Court had "approved . . . a similar instruction" on the HAC factor in *Bankhead*. *Sneed Direct II*, 1 So. 3d at 118.[11]

---

[11] In *Bankhead*, the appellant argued that "the trial court did not sufficiently restrict the applicability of [the HAC factor] to [his] conduct in the [stabbing death of the victim]." *Bankhead*, 585 So. 2d at 125. According to the appellant, the sentencing court's failure to limit the scope of the HAC "aggravating circumstance to [his] personal conduct . . . subverted the mandate for individualized capital sentencing." *Id.* at 124. Rejecting this contention, the Alabama Supreme Court explained that the HAC factor "emphasizes . . . the manner of the killing, not . . . the defendant's actual participation." *Id.*

**b.**

In his petition to this court, Sneed asserts an entitlement to habeas relief consistent with his collateral HAC subclaim minus the argument about the irrelevancy of an offender's mental state. *Compare* doc. 1 at 116-19 ¶¶ 200-05, *with* doc. 26-10 at 36-42. Constitutionally, Sneed alleges that the trial court's HAC "instruction, application, and finding . . . violated his rights to due process, a fair trial[,] and a reliable sentence." Doc. 1 at 118-19 ¶ 205. Sneed ties these allegedly-infringed rights loosely to the Fifth, Sixth, Eighth, and Fourteenth Amendments as he did on direct review. *Compare* doc. 1 at 119 ¶ 205, *with* doc. 26-10 at 47. But Sneed's references to channeling the jury's discretion and reserving capital punishment for the worst offenders are Eighth Amendment principles. Doc. 1 at 116-17 ¶¶ 202-03. Consequently, Sneed's HAC allegations trigger the Eighth and Fourteenth Amendments—merged under the incorporation doctrine.[12]

To support an AEDPA (d)(1) opening of extreme constitutional error, Sneed cites five Supreme Court decisions: *Maynard v. Cartwright*, 486 U.S. 356 (1988);[13]

---

[12] In Claim E, the court explained why Sneed's remaining allegations tied to other amendments were inadequate to support habeas relief. Consistent with that discussion, the court denies Claim G to the extent Sneed relies upon purported or unsubstantiated rights arising under the Fifth, Sixth, or freestanding Fourteenth Amendment.

[13] In *Maynard*, the Supreme Court affirmed an Eighth Amendment judgment that "the words 'heinous,' 'atrocious,' and 'cruel' did not on their face offer sufficient guidance to the jury" to apply

*Godfrey v. Georgia*, 446 U.S. 420 (1980) (plurality opinion);[14] *Espinosa v. Florida*,

505 U.S. 1079 (1992) (per curiam);[15] *Stringer v. Black*, 503 U.S. 222 (1992), *holding*

*modified on other grounds by Brown v. Sanders*, 546 U.S. 212 (2006);[16] and *Roper*.[17]

Doc. 1 at 116-17 ¶¶ 202-03. Accepting that some excerpts from these Eighth

Amendment opinions seemingly strengthen Sneed's HAC habeas claim, the

---

that aggravating circumstance. 486 U.S. at 359-60.

[14]*Godfrey* involved Georgia's "'outrageously or wantonly vile, horrible and inhuman'" aggravating circumstance. The Court found "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 428.

[15]The *Espinosa* Court considered whether a sentencing court's "indirect weighing of an invalid aggravating factor create[d] the same potential for arbitrariness as the direct weighing of an invalid aggravating factor." 505 U.S. at 1082. The Court concluded that the Florida death sentence reached under these circumstances was unconstitutional. Specifically, the Court "h[e]ld that, if a weighing State decides to place capital sentencing authority in two actors[—the judge and an advisory jury—]rather than one," then the Eighth Amendment precludes "[]either actor . . . [from] weigh[ing] invalid aggravating circumstances." *Id. Espinosa* is not helpful here, however, because Sneed has not established that the Alabama courts based his death sentence partially upon an invalid HAC factor.

[16]Akin to *Maynard*, the *Stringer* Court faced a HAC-vagueness challenge tied to a Mississippi death sentence. *Stringer*, 503 U.S. at 226. The petitioner's case became final in state court before the Supreme Court decided *Maynard* and another invalid-factor decision, *Clemons v. Mississippi*, 494 U.S. 738 (1990). Thus, *Stringer* addressed primarily whether the habeas petitioner could rely retroactively on the invalidation principles from *Maynard* and *Clemons* "because either or both announced a new rule." *Stringer*, 503 U.S. at 225. The Supreme Court held in the petitioner's favor. *Id.* at 237. Unfortunately, nothing in *Stringer* sheds light, much less clearly establishes, the validity of Sneed's Eighth Amendment HAC challenge as a nontriggerman.

[17]*Roper* held that the Eighth Amendment prohibits "the imposition of the death penalty on juvenile offenders under 18," 543 U.S. at 568, a decision that is even more removed from Sneed's HAC allegations than the other cases he cites.

holdings—as outlined briefly in footnotes 13-17, which are all that matter under (d)(1)—do not. Specifically, none of these authorities confirms to what extent, if any, the application of the HAC factor in support of a nontriggerman's death sentence violates the Eighth Amendment. As such, the reliance upon them is misplaced.

Similarly, the cases which Sneed mentions in reply do not substantiate that his HAC claim meets the (d)(1) hurdle. For example, relying upon an excerpt from *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995), Sneed asserts that the trial court's finding of the HAC factor was "questionable." Doc. 31 at 103. The citation does not move the bar in Sneed's favor because the Eleventh Circuit did not analyze the HAC circumstance in that case. *See Jackson*, 42 F.3d at 1355 (discussing the petitioner's habeas claims).

Next, citing a collection of Eleventh Circuit cases beginning with *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263 (11th Cir. 2014), Sneed argues that the circumstances in them "were far more heinous or aggravating than those" in his capital case. Doc. 31 at 80-81. But again, the referenced decisions—as reflected in Sneed's parenthetical descriptions—do not include a constitutional analysis of the HAC circumstance. And only one decision—*Harris v. Dugger*, 874 F.2d 756, 759 n. 2 (11th Cir. 1989)—mentioned the HAC factor, but only as an uncontested aggravating finding supporting the death penalty. Thus, none of the cited authorities

show that the ACCA deviated directly or unreasonably from clearly established Supreme Court precedent in rejecting Sneed's HAC challenge.

Moreover, the ACCA's analysis is consistent with the Eleventh Circuit's HAC holding in *White v. Wainwright*, 809 F.2d 1478 (11th Cir. 1987).[18]  Before discussing the HAC issue, the Eleventh Circuit found that the petitioner's participation in the offenses, as a nontriggerman, satisfied the *Enmund*—now the *Enmund-Tison*— standard. *White*, 809 F.2d at 1481-84. The petitioner in *White* "urge[d] that th[e] [HAC] aggravating circumstance c[ould] [not] be . . . constitutionally applied to a non-triggerman and that such an application [would be] overbroad." 809 F.2d at 1485. "[D]isagree[ing]" with the petitioner, the Eleventh Circuit explained that "[t]he *Enmund* case represent[ed] the constitutional limitation on the imposition of the death penalty on non-shooters." *White*, 809 F.2d at 1485. Given those facts which substantiated the petitioner's "intent to use lethal force" under *Enmund*, *White*, 809 F.2d at 1484, the Circuit held that the Constitution did not preclude reliance upon the HAC factor in sentencing, *id.* at 1485. The Eleventh Circuit elaborated that "[t]he findings" from the *Enmund* assessment "indicate[d] that [the petitioner] was sufficiently involved in the[] 'especially heinous, atrocious and cruel' killings that [a]

---

[18]*White* predates *Tison* and AEDPA.

. . . death [sentence] . . . [wa]s not unconstitutionally overbroad." *Id.* Consequently, the HAC holding in *White*—which is binding on this court—forecloses Sneed from obtaining habeas relief under either clause of (d)(1).

c.

Sneed's mental state, as part of the HAC inquiry, is the focus of his (d)(2) evidentiary argument. The gist of Sneed's contention is that the ACCA based the rejection of his HAC subclaim on unreasonably-determined facts about his mental state. Doc. 1 at 118 ¶ 204. According to Sneed, "simply no evidence [existed] to support any assertion that [he] personally desired to inflict a high degree of pain or that he wanted . . . Mr. Hardy" to murder Mr. Terry in a certain manner. Doc. 1 at 118 ¶ 204. Sneed maintains that inferences about his intentions were "impossible" to draw "from Mr. Hardy's spontaneous actions," and that the State did not introduce evidence of Sneed's "wishes" or any pre-offense "understanding" about how Hardy would murder Mr. Terry. *Id.* And, in further support of his contention, Sneed notes that, in reversing his first death sentence on guilt-phase grounds, the Alabama Supreme Court discussed the videotape's inability "to capture Sneed's intent at the time [he] and Hardy entered the store." Doc. 1 at 11 ¶ 10; Doc. 31 at 13 n. 3; *see also Sneed ASC Direct I*, 783 So. 2d at 869 (discussing the security footage as inadequate to "overcome the distort[ions]" which his redacted statement created, including

portraying him "as the central figure in the crime" and undermining his "defense that he lacked the specific intent to commit murder").

Sneed's factual contentions arise outside the ACCA's rationale for rejecting his HAC subclaim. More specifically, the ACCA's analysis of the HAC factor did not turn upon the sentencing court's findings about Sneed's mental state. Instead, the ACCA held that the trial court properly used the HAC factor in sentencing Sneed in light of the jury's guilt-phase finding that satisfied the *Enmund-Tison* test. Similarly, Sneed's factual contentions about his mental state are not pertinent to the ACCA's plain-error review of the HAC jury charge. Finally, in the absence of any challenge to the facts relevant to the last reasoned decision denying his HAC challenge in state court, Sneed cannot prevail under (d)(2) on habeas review.

In sum, Sneed falls short of his AEDPA burden with his HAC allegations. Consequently, the court denies Claims G.

## 4.

In Claim D, Sneed argues that the jury's "[k]nowledge of [his] prior conviction and sentence destroyed his presumption of innocence and diminished the jurors' sense of responsibility." Doc. 1 at 99 ¶ 167. Sneed divides this claim into two subparts. One, Sneed faults trial counsel for failing to object to the prosecutor's "repeated[] reference[s] [to the] 'prior proceeding'" and a forensic witness's

testimony about exhibits "introduced in the first trial." *Id.* at 100, 102 ¶¶ 168, 174; *Sneed Direct II*, 1 So. 3d at 114 (emphasis and internal quotation marks omitted). Two, Sneed maintains that several jurors discussed extraneous matters during deliberations, including his prior conviction and death sentence as well as the outcome of Hardy's capital case. Doc. 1 at 104 ¶ 179. Allegedly, the jury's consideration of this "extraneous evidence violate[d] [Sneed's] Sixth and Fourteenth Amendment[] [rights]." Doc. 1 at 103 ¶ 177.

**a.**

In response to Respondent's contention that these claims are procedurally defaulted, Sneed maintains that he asserted the same issues in his first subclaim on direct appeal to the ACCA "and again in his application for rehearing." Doc. 31 at 46. Consequently, Sneed argues that Respondent's procedural challenge of his habeas allegations "is a misstatement of law." *Id.* A review of Sneed's assertions on direct review and the contents of his habeas allegations shows, however, that the claims are different in scope. More specifically, Sneed's allegations about trial counsel's unreasonable failure to object appear only in his habeas petition. Consequently, with respect to his newly asserted ineffective assistance claim, Sneed is the party with an unsustainable position.

*i.*

Sneed argued on appeal that the prosecutor's repeated remarks about the prior proceeding and the testimony, which mentioned his "first trial" directly, revealed to "the jury . . . that [he] had previously been convicted of capital murder and sentenced to death." *Sneed Direct II*, 1 So. 3d at 114. Because trial counsel "did not object to the references at trial, [the ACCA] review[ed] them for plain error." *Id.* The ACCA explained that all but one mention of the case's history referred "to a prior proceeding, in compliance with the trial court's [pretrial] instructions." *Id.* Regardless, the ACCA concluded that none "specifically informed the jury" about Sneed's capital conviction and sentence. *Id.* Thus, the ACCA ruled that the State's references to his first trial did not amount to plain error. *Id.* at 114-15.

Sneed never asserted in his appeal that trial counsel performed ineffectively by not objecting to these references contemporaneously. Doc. 26-10 at 27-32. "A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration." *Cone v. Bell*, 556 U.S. 449, 467 (2009). And in light of Sneed's failure to fairly tie these allegations to *Strickland*, on either direct or collateral review, Sneed never exhausted the ineffectiveness aspect of this habeas subclaim in state court properly. Thus, Respondent is correct that unexhausted

procedural default bars Sneed's ineffectiveness allegations incorporated into this subclaim.

### ii.

Alternatively, the court accepts that Sneed may seek habeas relief on issues unrelated to the alleged ineffective assistance. Even so, Sneed has not demonstrated that the ACCA's rejection of those constitutional assertions was contrary to or an unreasonable application of Supreme Court precedent. In particular, Sneed alleged on direct appeal and reasserts on habeas review that the remarks of the prosecutor and forensic witness about the prior trial violated "his rights to a fair and impartial jury, due process, presumption of innocence, and a reliable conviction and sentence." *Compare* doc. 26-10 at 32, *with* doc. 1 at 102 ¶ 175. And while the Supreme Court decisions which Sneed cites in support contain references to core principles of fairness applicable in criminal proceedings, the facts that shaped the holdings in these opinions do not overlap contextually with Sneed's allegations.[19]

---

[19]*See, e.g.*, *Deutch v. United States*, 367 U.S. 456, 471 (1961) (identifying the presumption of innocence as one of several "safeguards of a fair procedure" afforded to an accused) (internal quotation marks omitted). *But see Deutch*, 367 U.S. at 457 ("review[ing] a criminal conviction for refusal to answer questions before a subcommittee of the Committee on Un-American Activities of the House of Representatives"); *Caldwell v. Mississippi*, 472 U.S. 320, 340-41 (1985) (plurality opinion) (reversing capital sentence as unreliable under the Eighth Amendment because "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death" with "focused, unambiguous, and strong" prosecutorial comments); *Caldwell*, 472 U.S. at 342 (O'Connor, J. concurring in part and in the judgment) ("[T]he prosecutor's remarks were impermissible [under the Eighth Amendment] because they were inaccurate and misleading in a

Additionally, the constitutional guideposts clearly established in *Caldwell* and *Romano* place the ACCA's plain-error rejection of the exhausted allegations in this subclaim well within AEDPA's sizeable deferential range. For example, the remarks Sneed challenges do not approach the harmful degree of those in *Caldwell*, which misleadingly minimized the jury's role in rendering a death sentence. *Caldwell*, 472 U.S. at 342. And Sneed's challenged references are more benign than the admitted, and later reversed, capital judgment in *Romano*, which "did not deprive petitioner of a fair sentencing proceeding." *Romano*, 512 U.S. at 13. Thus, AEPDA precludes this court from awarding habeas relief on the state-court adjudicated remainder of this habeas subclaim. 28 U.S.C. § 2254(d).

### b.

The second part of Claim D maintains that several jurors discussed extraneous matters, including Sneed's prior conviction and death sentence. Doc. 1 at 104 ¶ 179. Sneed acknowledges that he presented this subclaim "for the first time" in this petition. Doc. 31 at 47. But according to Sneed, the procedural default exception

---

manner that diminished the jury's sense of responsibility."); *Romano v. Oklahoma*, 512 U.S. 1, 10, 13 (1994) (holding that admitted evidence of a prior, but later vacated, capital conviction and sentence in the penalty phase of an unrelated case was neither a *Caldwell*, Eighth Amendment evidentiary, nor freestanding Fourteenth Amendment Due Process violation).

discussed in Claim F—cause and prejudice—excuses his failure to exhaust that subclaim in state court.

### i.

Sneed argues that "cause exists because trial counsel . . . were unaware the jurors had knowledge of his prior conviction at the time of his trial in 2006." Doc. 31 at 47. Sneed adds that post-conviction counsel did not discover this evidence until ten years later when they interviewed the jurors. *Id.* at 48. But Sneed does not address the opportunity his counsel had to interview the jurors earlier, asserting this claim in a post-trial motion, and satisfying the exhaustion requirement on direct review. And although, if pursued separately in state court, ineffective assistance of trial or appellate counsel may serve as cause, Sneed neither makes that argument nor offers an exhausted *Strickland* claim validating that method. For these reasons, Sneed has not established cause for the unexhausted procedural default of his jury-deliberations subclaim.

### ii.

Sneed has also not demonstrated prejudice. Sneed alleges generally that the jury had knowledge of and discussed his and Hardy's capital case histories, doc. 1 at 104 ¶ 179, including that "two jurors [commented before deliberations] that . . . Sneed was guilty and deserved whatever . . . Hardy . . . had gotten," *id.* ¶ 178. Sneed

contends that the extraneous information, which the jury discussed and upon which two members based a premature guilt-phase opinion, violated his right to an impartial jury under the Sixth and Fourteenth Amendments. Doc. 31 at 48.

Most of the cases which Sneed cites in support are off point. Doc. 1 at 103-06 ¶ 176-77, 182-83; Doc. 31 at 48.[20]  One case, *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002), suggests that Sneed's allegations may have constitutional merit. The petitioner in *Fullwood* argued that he did not receive "a fair trial at his resentencing." *Id.* at 675. According to the petitioner, the jury "was subject to improper contact with third parties and considered extraneous information that the parties did not introduce at trial and the court did not provide to them." *Id.* As evidentiary support, the petitioner "relie[d] . . . upon [a] post-trial affidavit of . . . [a] [person]" who served on the

---

[20]*See, e.g.*, *In re Murchison*, 349 U.S. 133, 139 (1955) (holding that the due process clause prohibits the same trial judge from both holding a secretive contempt proceeding and presiding over the later hearing on the contempt charges); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (vacating habeas petitioner's capital judgment under the Fourteenth Amendment because of unfairness from a "huge . . . wave of public passion [and publicity pretrial] and . . . a jury . . . in which two-thirds of the members admit[ted], before hearing any testimony, to . . . belie[ving] in his guilt"); *Remmer v. United States*, 347 U.S. 227, 228-30 (1954) (holding that an ex parte F.B.I. investigation into a reported improper communication "with a . . . juror, who afterwards became the . . . foreman" warranted a new federal trial without reference to a constitutional violation); *Frady*, 456 U.S. at 174 (concluding that "no substantial likelihood [existed that] erroneous malice instructions prejudiced [the petitioner]'s chances with the jury"); *see also Turner v. Louisiana*, 379 U.S. 466, 474 (1965) (reversing capital judgment on Fourteenth Amendment due process grounds because "two key prosecution witnesses . . . were . . . deputy sheriffs," who guarded the sequestered jurors "during the entire period of the trial"); *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (announcing the actual innocence "gateway standard" to overcoming a procedurally defaulted guilt-phase claim); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (discussing the actual innocence standard applicable when a petitioner argues that "he is actually 'innocent of the death penalty'").

resentencing jury. This juror reported several concerns she had about the second penalty-phase process. Akin to Sneed's allegations, the juror stated that "outside sources" caused the members to "bec[o]me aware" that the petitioner's first death sentence "had been reversed because of some technicality involving a mistake the trial judge had made." *Id.* (internal quotation marks omitted).

Relying on *Irvin* and *Turner*, the *Fullwood* court cautioned that the resentencing jury's extraneous knowledge of the "prejudicial information about [the history of the petitioner's] case" implicated the Sixth Amendment. *Id.* at 682. The Fourth Circuit explained that the petitioner "ha[d] made a sufficient threshold showing that these facts were extraneous, prejudicial and improperly brought to the jury's attention." *Id.* Therefore, the court sent the case back to the district court to hold an evidentiary hearing to determine whether the information "had a substantial and injurious effect or influence in determining the jury's [resentencing]." *Id.* (internal quotation marks omitted).

Sneed has not pointed to any guilt-phase authority—binding or persuasive—which resembles *Fullwood*. Still, the court accepts that the Eleventh Circuit might recognize a cognizable impartial jury claim under Sneed's alleged circumstances. *See Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."). But accepting

that his allegations are sufficient to state an impartial jury claim in the guilt phase does not end the prejudice inquiry. Instead, Sneed must show that excluding the constitutionally-compromising case information from deliberations would create a reasonable probability of a non-capital conviction in a retrial.

Here, *Fullwood* does not satisfy Sneed's reasonable probability burden for several reasons. First, procedural default was not an issue in *Fullwood*. Second, the Fourth Circuit faced problems in the deliberative sentencing process beyond the jury's improper access to extraneous information. Specifically, *Fullwood* also concerned whether a third-party husband's "presumptively prejudicial" discussions with his wife (who was a juror) were designed to influence the resentencing outcome in favor of death. *Id.* at 678 (internal quotation marks omitted). Consequently, *Fullwood*'s persuasive value is minimal. And Sneed fails to identify other authorities which point to the existence of actual prejudice in the guilt-phase context of his specific impartial jury allegations.[21]

_____

[21]Sneed cites many cases in reply for principles fundamental to procedural default but provides no corresponding context. Doc. 31 at 47-48. Reviewing these additional authorities confirms that none involves circumstances comparable to his. *See, e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J. concurring in judgment) (identifying, in addressing an unconstitutional guilty plea claim, the "situations in which an otherwise valid state ground will not bar federal claims"); *Carrier*, 477 U.S. at 497 (concluding that "procedurally defaulted discovery claim" could not support habeas relief unless "the victim's statements contain[ed] material that would establish . . . actual innocence"); *Amadeo v. Zant*, 486 U.S. 214, 228-29 (1988) (reversing judgment that procedural default barred the petitioner from pursuing his unconstitutional jury composition claim); *Reed*, 468 U.S. at 3, 20 (concluding that the petitioner's invalid jury instruction

### *iii.*

Likewise, Sneed does not address the solid incriminating evidence which underlies his conviction. Specifically, the State's guilt-phase evidence included Sneed's pre-offense selection of Bud's Convenience Store for the robbery because Mr. Terry was there alone and the security footage of the capital offense. That video was highly probative of Sneed's particularized intent to kill. The clip captured Sneed's continuing presence at the murder scene, active participation in the robbery, and unconcerned reaction to Hardy's unprovoked shooting of Mr. Terry. Thus, the strength of the State's case for conviction means that Sneed's impartial jury allegations—if cognizable—fall short of demonstrating the reasonable probability of a lesser conviction without the extraneous capital case histories. *Cf. McCoy*, 953 F.2d at 1262 ("[T]he other substantial evidence of [the petitioner]'s guilt negates any possibility of prejudice resulting from his attorney's failure to subpoena the alibi witnesses.").

---

claim "was sufficiently novel . . . to excuse his attorney's failure to raise [it]" and constituted cause); *Ward*, 592 F.3d at 1152 ("conclud[ing] that an improper bailiff-jury communication during the penalty phase violated [the petitioner]'s constitutional right to a fair trial and a reliable sentence"); *McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) (per curiam) (declining to review the merits of [several] . . . federal claims" because the petitioner had not met the cause and prejudice exception).

*iv.*

Respondent argues alternatively that Sneed's tainted deliberation allegations are too vague to meet § 2254's heightened pleading requirement. Doc. 24 at 77; *cf. Brown v. Dixon*, No. 19-60704-CIV, 2022 WL 1197657, at *8 (S.D. Fla. Mar. 15, 2022) ("[A]llegations [supporting cause and prejudice] must be factual and specific, not conclusory.") (internal quotation marks omitted) (quoting *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)), *appeal filed* Apr. 25, 2022. Respondent challenges concretely the missing "names of the jurors [interviewed] to support this claim." Doc. 24 at 77. Sneed does not resist this independent reason for dismissal in reply. *See generally* doc. 31 at 46-49. Consistent with his silence, Sneed has conceded Respondent's point of inadequate pleading and abandoned the claim as a basis for habeas relief. [22]

Accordingly, the court denies Claim D for these multiple reasons.

---

[22] *See, e.g.*, *Tharpe v. Humphrey*, No. 5:10-CV-433 CAR, 2014 WL 897412, at *3 n. 4 (M.D. Ga. Mar. 6, 2014) (recognizing that merely alleging a habeas claim without developing argument constitutes abandonment), *aff'd sub nom. Tharpe v. Warden*, 834 F.3d 1323 (11th Cir. 2016); *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012) (per curiam) ("A party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." (quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n. 8 (11th Cir. 2003)); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n. 13 (11th Cir. 2007) (explaining that a court need not address a "perfunctory and underdeveloped argument" that lacks legal authority or elaboration).

**5.**

Sneed contends primarily in Claim A that the sentencing court's override of the advisory life verdict violated his jury-trial guarantee under the Sixth Amendment. Doc. 1 at 18, 28-29 ¶ 44. Aligned with the Eighth Amendment's cruel and unusual punishment clause, Sneed alleges also that the override decision "was arbitrary[,] . . . fundamentally unfair, and denied [him] a fair and reliable sentencing governed by due process." *Id.* at 18 ¶ 27.

Overlapping with Claim A, Sneed alleges in Claim H that "Alabama's standardless override results in an arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments." Doc. 1 at 119 (emphasis omitted). Sneed adds that the override is unconstitutional "[f]acially, and as applied" because of "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."[23] *Id.* at 119-20 ¶ 206 (internal quotation marks omitted).

---

[23]"A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See also United States v. Stevens*, 559 U.S. 460, 472 (2010) (reaffirming use of *Salerno* facial standard). Under the "more limited" as-applied approach, *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013), a challenger contests the application of a law "to the particular facts of [his] case," *Salerno*, 481 U.S. at 745 n. 3. "Although the boundary between these two forms of relief is not always clearly or easily demarcated, . . . . [courts] look to the scope of the relief requested to determine whether a challenge is facial or as-applied in nature." *Scott*, 717 F.3d at 862. "[R]elief that is quasi-facial in nature— . . . relief that reaches beyond the [challenger] in a case[—

In both claims, Sneed argues that the ACCA's rejection of his challenge warrants habeas relief under AEDPA's contrary to and unreasonable application clauses. *Id.* at 29, 121 ¶¶ 44, 210. Sneed contends additionally in Claim H that he meets (d)(2) of AEDPA because the ACCA supported its decision with unreasonable factual determinations. Doc. 1 at 121 ¶ 210.

As explained below, Sneed's efforts to satisfy his demanding burden under AEDPA's highly deferential design are unconvincing. Three Supreme Court decisions are the heart of Sneed's override challenge: *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Hurst*. Doc. 1 at 18, 20-25 ¶¶ 27, 30-38. The court begins with a summary of these key Sixth Amendment sentencing cases.

**a.**

*Apprendi* addressed the interplay between the right to a jury trial and sentencing in a non-capital case. Determining, by a preponderance of the evidence, that the petitioner's firearm conviction was a hate crime under state law, the trial court in *Apprendi* increased the maximum prison sentence from 10 to 20 years. *Apprendi*, 530 U.S. at 468-69. The Supreme Court concluded that the State's

---

]" triggers the *Salerno* standard. *Id.*

enhancement procedure for hate crimes was "an unacceptable departure from the jury tradition" and reversed the judgment. *Id.* at 497. Thus, *Apprendi* requires a jury to find, beyond a reasonable doubt, the existence of "any fact [(but for an offender's prior convictions)] that increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490.

After *Apprendi*, the Court revisited in *Ring* Arizona's former capital sentencing framework, which had survived Sixth Amendment scrutiny in *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled by Ring*, 536 U.S. at 609. Under Arizona's prior structure, a convicted defendant "could not be sentenced to death, the statutory maximum penalty for first-degree murder" without a separate judicial finding of "at least one aggravating circumstance and . . . no mitigating circumstances sufficiently substantial to call for leniency." *Ring*, 536 U.S. 592-93 (internal quotation marks omitted); *see Walton*, 497 U.S. at 649 (concluding that the Sixth Amendment does not require a state "to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances"). Thus, the jury played no role in the pre-*Ring* Arizona capital-sentencing process. *See Walton*, 497 U.S. at 643 (explaining that "[a]fter a person ha[d] been found guilty of first-degree murder . . . . the court alone" decided whether to impose the death penalty) (internal quotation marks omitted). Concluding that the Sixth Amendment outcome in *Walton* was

incompatible with its holding in *Apprendi*, the Court overruled *Walton*. *Ring*, 536 U.S. at 609.

*Ring* led the Court to invalidate Florida's former capital-sentencing structure under the Sixth Amendment in *Hurst*. *Hurst*, 577 U.S. at 102. Pursuant to Florida's prior framework, "the maximum sentence a capital felon [could] receive on the basis of the conviction alone [wa]s life imprisonment." *Id.* at 95. Postconviction, a jury provided an advisory sentence based on an evidentiary hearing, and a judge held "a separate hearing . . . [to] determine whether sufficient aggravating circumstances existed to justify imposing the death penalty." 577 U.S. at 94. In the defendant's case specifically, a Florida jury found him guilty of "premediated murder[—a capital felony—] . . . for an unlawful killing during a robbery" over a lesser and non-capital charge of felony murder. 577 U.S. at 95. "A penalty-phase jury recommended [7 to 5] that . . . [the] judge impose a death sentence," 577 U.S. at 94, and "[t]he judge independently agreed," *id.* at 96.

The *Hurst* Court concluded that Florida's statutory structure overlapped with Arizona's *Ring*-deficient approach. *Hurst*, 577 U.S. at 98-99. Specifically, the petitioner's death sentence violated his "right to an impartial jury," *id.* at 102, because "the maximum punishment [the petitioner] could have received without any judge-made findings was life in prison without parole," *id.* at 99. The Court clarified that

"[a] jury's mere recommendation" in favor of the death penalty "is not enough" to satisfy the constitutional requirement that "a jury, not a judge, . . . find each fact necessary to impose a sentence of death." 577 U.S. at 94; *see also id.* at 102 (overruling prior precedent "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty").

**b.**

Sneed argued on direct review that his death sentence was unsustainable under *Ring*.[24]  *Sneed Direct II*, 1 So. 3d at 143. Sneed claimed that his punishment violated *Ring* because the jury's advisory verdict lacked specific aggravating findings and did not reflect a "unanimous[] determin[ation] that statutory aggravating circumstances were present[,] . . . [or] that the aggravating circumstances outweighed the mitigating circumstances." *Sneed Direct II*, 1 So. 3d at 143. Sneed asserted also that the trial court's decision to override the jury's advisory verdict was arbitrary—an allegation associated with the Eighth Amendment's prohibition against cruel and unusual punishments. *Sneed Direct II*, 1 So. 3d at 143.

---

[24]Sneed's direct appeal proceedings began post-*Ring* and ended pre-*Hurst*. *Sneed Direct II*, 1 So. 3d at 143. Consequently, *Hurst* was not part of Sneed's Sixth Amendment override challenge.

Concerning the aggravating circumstances subclaim, the ACCA pointed to the jury's unanimous guilt-phase finding that Sneed had "committed a robbery during the . . . commi[ssion] of a murder" beyond a reasonable doubt. *Sneed Direct II*, 1 So. 3d at 143. Under Alabama's framework, the robbery-murder conviction triggered penalty-phase proceedings, transferred as an aggravating factor, and exposed Sneed to a potential death sentence. Following Alabama Supreme Court precedent, the ACCA observed that a "jury's unanimous finding of one aggravating circumstance is sufficient to satisfy *Ring*." *Sneed Direct II*, 1 So. 3d at 143 (internal quotation marks omitted) (quoting *Ex parte McNabb*, 887 So. 2d 998, 1006 (Ala. 2004)). Consequently, the ACCA disagreed with Sneed that the record on aggravating circumstances fell short of *Ring*'s Sixth Amendment capital-sentencing standard. *Sneed Direct II*, 1 So. 3d at 143.

As for Sneed's contention that the penalty-phase balancing process violated his right to a jury trial, the ACCA recognized that the Alabama Supreme Court had foreclosed that Sixth Amendment issue too. *Sneed Direct II*, 1 So. 3d at 143 (first quoting *Ex parte Hodges*, 856 So. 2d 936, 943 (Ala. 2003); and then quoting *Ex parte Waldrop*, 859 So. 2d 1181, 1190 (Ala. 2002)). Specifically, the ACCA explained that "whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense." *Sneed Direct II*, 1 So. 3d at 143

(internal quotation marks omitted). With the understanding that the balancing process does not involve determining facts, the ACCA observed that neither *Ring* nor *Apprendi* "require[s] that a jury weigh the aggravating circumstances and the mitigating circumstances." *Sneed Direct II*, 1 So. 3d at 143 (internal quotation marks omitted).

The ACCA disposed of Sneed's arbitrary override "argument" as one "without merit." *Id.* at 144. Here, the ACCA referred to *Harris v. Alabama*, 513 U.S. 504 (1995), in which the Supreme Court upheld the constitutionality of Alabama's judicial override provision under the Eighth Amendment. *Sneed Direct II*, 1 So. 3d at 143-44; *see also Harris*, 513 U.S. at 512 ("hold[ing] that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict"); *id.* at 515 ("The Constitution permits the trial judge, acting alone, to impose a capital sentence."). The ACCA noted that *Ring* "did not invalidate [the] earlier holding in *Harris*." *Sneed Direct II*, 1 So. 3d at 143. Consequently, the ACCA rejected Sneed's arbitrary override claim. *Id.* at 144.

### c.

With this background in mind, the court considers Sneed's habeas override claim and starts with the Sixth Amendment component.

*i.*

The gist of Sneed's Sixth Amendment habeas override allegations is that "[t]he imposition of a death sentence . . . violated [his] rights under *Apprendi*, *Ring*, and *Hurst*, in that the jury did not make the fact-finding necessary for a death sentence to be imposed." Doc. 1 at 25 ¶ 38. To overcome AEDPA deference, Sneed relies heavily upon *Hurst*.

According to Sneed, *Hurst* is "a natural and logical application of *Apprendi* and *Ring*." Doc. 1 at 22 ¶ 32. Sneed argues that the similarities between Florida's pre-*Hurst* capital sentencing structure and the application of Alabama's judicial override provision in his capital case mean that his affirmed death sentence is objectively wrong under the Sixth Amendment. But central to § 2254(d)(1)'s contrary to and unreasonable application clauses is the existence of "clearly established Supreme Court law," "at the time" of the last merits-based denial of an appealed constitutional claim. *Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1316 (11th Cir. 2015). Here, the ACCA reviewed Sneed's claims in his second direct appeal substantively, and the Alabama Supreme Court declined review. Consequently, only Supreme Court precedent predating the ACCA's 2007 decision in *Sneed Direct II* qualifies as clearly established Sixth Amendment law for (d)(1) purposes. *See Greene*, 565 U.S. at 39-40 (explaining that if a state supreme court declines to hear an appeal, the date of the

intermediate appellate decision is the "temporal cutoff" for clearly established Supreme Court precedent).

The court accepts for analysis purpose that *Hurst* establishes the Sixth Amendment unsoundness of Alabama's former judicial override scheme without any ambiguity. Still, such hypothetical clarity from *Hurst* did not exist until nearly ten years after *Sneed Direct II*. And because "§ 2254(d)(1) requires federal courts to . . . measure state-court decisions against th[e] [Supreme] Court's precedents as of the time the state court renders its decision," *Greene*, 565 U.S. at 38 (alterations added) (internal quotation marks and emphasis omitted) (first quoting *Cullen*, 563 U.S. at 182; and then quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)), that gap in time means that Sneed cannot rely upon *Hurst* to prove objective constitutional error occurred on direct review in state court.

Additionally, the Supreme Court has clarified that "*Hurst* do[es] not apply retroactively on collateral review." *McKinney v. Arizona*, 140 S. Ct. 702, 708 (2020) (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)). Thus, *Hurst* is beyond Sneed's reach under (d)(1) and the Supreme Court's retroactivity framework under *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion). *See Greene*, 565 U.S. at 39 ("explain[ing] that AEDPA did not codify *Teague*, and that the AEDPA and *Teague*

inquiries are distinct") (internal quotation marks omitted) (quoting *Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam)).[25]

### *ii.*

The Supreme Court issued the predecessor opinions to *Hurst*—*Ring* and *Apprendi*—before the conclusion of Sneed's second direct appeal, and *Ring* was the express basis for Sneed's override claim in state court. Thus, this court must determine whether the ACCA's rejection of Sneed's Sixth Amendment override challenge was contrary to or an unreasonable application of the holdings in *Ring* and *Apprendi*.

Considering *Apprendi* first, the non-death penalty context of that decision is too dissimilar from Sneed's override claim. Specifically, *Apprendi* neither dictates an opposite outcome under (d)(1)'s first clause nor illustrates an unreasonable application in the ACCA's resolution of Sneed's override claim under (d)(1)'s second clause. Thus, *Apprendi* does not establish that the ACCA committed clearly established error under AEDPA.

---

[25]Alternatively, *Hurst*'s Sixth Amendment holding falls short of showing clearly established error on the part of the ACCA akin to the *Ring* analysis below. Materially missing from the invalidated Florida and Arizona formats in *Hurst* and *Ring* was the requirement that a jury find an aggravating factor beyond a reasonable doubt unanimously before imposing the death penalty.

As a capital-sentencing decision, *Ring* is contextually closer to Sneed's override claim. *Ring* addressed whether Arizona's capital sentencing framework—which lacked any unanimous jury finding in aggravation beyond a reasonable doubt—violated the petitioner's right to a jury trial under the Sixth Amendment. The Court invalidated Arizona's exclusively judicial-sentencing approach as an impermissible infringement upon the right to a jury trial.

*Ring* does not help Sneed because Alabama sentenced him under a materially distinguishable sentencing structure. Specifically, Alabama utilized a system that required a unanimous jury determination of an aggravating factor beyond a reasonable doubt in the guilt phase of a capital case as a prerequisite to a death sentence. Thus, *Ring* is unpersuasive as a first-clause (d)(1) authority.

*Ring* also does not help Sneed in the (d)(1) second-clause analysis. First, again, *Ring*'s scope does not address a capital-sentencing structure like Alabama's—one in which a jury finding in aggravation is a prerequisite to imposing the death penalty. Second, *Ring* did not consider a Sixth Amendment claim challenging judicial override or a death sentence in which a judge found an additional aggravating factor independent of a jury. And even accepting that *Ring* raises concerns about the ACCA's denial of Sneed's override claim under the Sixth Amendment, Sneed must do more than merely cast doubt on the ACCA's reasoning to benefit from (d)(1)'s

second clause. Instead, Sneed must persuade this court that the ACCA's denial of this

claim was so objectively wrong that no room for disagreement among fairminded

jurists exists. After all, the Court has made clear that "[a] state court's determination

that a claim lacks merit precludes federal habeas relief so long as fairminded jurists

could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at

101 (internal quotation marks omitted).[26]

---

[26]Indeed, in a concurring opinion, Justice Scalia, "with whom Justice Thomas join[ed]," endorsed the view that *Ring*'s holding did not invalidate a death sentence with unanimous jury support on one aggravating factor beyond a reasonable doubt. *Ring*, 536 U.S. at 612; *see id.* (explaining that under *Ring* a "jury must find the existence of the *fact* that an aggravating factor existed") (emphasis in original); *id.* at 612-13 ("Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of [an] aggravating factor in the sentencing phase or . . . placing the aggravating-factor determination . . . in the guilt phase.").

Additionally, two dissenters in *Ring* wanted the Court to overrule *Apprendi* instead of *Walton*. *Ring*, 536 U.S. at 619, 621 (O'Connor, J. dissenting) (Rehnquist, C.J. joining). These justices "fear[ed]" the ripple effect of *Ring*'s "expan[sion] on *Apprendi*," including incentivizing petitioners to challenge their death sentences under Alabama's "hybrid sentencing scheme[]." *Ring*, 536 U.S. at 621; *id.* at 608 n. 6.

Thus, a more nuanced understanding of *Ring* reveals that Sneed relies upon an unsettled—rather than a clearly established—interpretation of that precedent to overcome AEDPA deference. In *Kilgore*, the Eleventh Circuit bolstered its AEDPA deferential analysis on the basis that the Supreme Court, in undergoing a *Teague* retroactivity assessment, had relied on dissenting opinions to demonstrate why "existing precedent" did not "dictate[] [a] holding in a case." *Kilgore*, 805 F.3d at 1311-12 (citing *Beard v. Banks*, 542 U.S. 406, 416 (2004)). Akin to *Kilgore*'s adoption of the *Beard* approach to claims requiring AEDPA deference, "the observations from [two of] [*Ring*]'s [concurring as well as two] dissenting Justices further illustrate that [Sneed's broader interpretation of *Ring*'s] holding was not clearly established in the Court's existing precedent." *Kilgore*, 805 F.3d at 1312.

*iii.*

Another Sixth Amendment authority that Sneed references is *Rauf v. Delaware*, 145 A.3d 430 (Del. 2016) (per curiam). Doc. 1 at 20 ¶ 29. The Delaware Supreme Court determined in *Rauf* that the State's "current death penalty statute violate[d] the Sixth Amendment role of the jury as set forth in *Hurst*." *Rauf*, 145 A.3d at 433. To substantiate its *Hurst*-driven holding, the state supreme court provided "succinct" responses to several certified questions on the roles of the judge and jury under Delaware's invalidated capital-punishment provisions.[27]  *Id.* at 433-34.

Comparable to Alabama's pre-repealed sentencing structure, Delaware required a unanimous jury finding that one aggravating circumstance existed beyond a reasonable doubt before the imposition of the death penalty. *Id.* at 433 n. 3. The jury played a non-binding role in sentencing, and the penalty proposed did not require unanimity. *Id.* at 432-33 & n. 4. In overriding a jury's recommendation, a sentencing court had the authority to consider proof of an aggravating factor, "independent of the jury." *Id.* at 434 & n. 3.

Against this backdrop, Sneed argues that the Delaware Supreme Court's Sixth Amendment analysis in *Rauf* means that the ACCA should have determined that his

---

[27]One justice dissented in *Rauf*. 145 A.3d at 501-07. And in separate concurring opinions, the justices in the majority expressed their "diversity of views" on the scope of the jury-trial guarantee in death sentences. *Id.* at 433-501.

death sentence by judicial override was unconstitutional. Doc. 1 at 20 ¶ 29. The court disagrees. To begin, the Delaware court relied primarily on *Hurst*, and this court has explained already why *Hurst* does not qualify as clearly established law or overcome AEDPA deference under (d)(1). Moreover, the Delaware Supreme Court's non-binding understanding of Supreme Court Sixth Amendment precedent in 2016 does not clearly establish that the ACCA applied *Ring* unreasonably to Alabama's override structure in 2007. Instead, the dissenting opinion in *Rauf* reinforces the room for fairminded disagreement on whether the ACCA rejected Sneed's Sixth Amendment override claim correctly.[28]

### iv.

The other Supreme Court decisions Sneed cites in support of Claim A analyze the death penalty's constitutionality under the Eighth Amendment's cruel and unusual punishments clause. *See* doc. 1 at 18 ¶ 27 (citing *Gregg v. Georgia*, 428 U.S. 153 (1976) (plurality opinion); *Godfrey*; *California v. Brown*, 479 U.S. 538 (1987), *holding modified by Boyde v. California*, 494 U.S. 370 (1990)). Consequently, these

---

[28]*Cf. Rauf*, 145 A.3d at 503 (Vaughn, J. dissenting) ("*Ring* stands only for the principle that the jury must find the existence of at least one statutory aggravating factor, unanimously and beyond a reasonable doubt, in order to elevate the defendant's maximum punishment from life imprisonment to death."); *Rauf*, 145 A.3d at 505-06 (observing that if the *Hurst* Court "had intended to broaden *Ring* to require that the jury make findings of fact in the weighing process or be the actual sentencing authority, I think it would have said so more directly and more expressly").

cases do not substantiate Sneed's contention that the ACCA committed clearly

established Sixth Amendment error in rejecting his judicial override claim.[29]

*v.*

These Supreme Court opinions or the additional ones Sneed includes in Claim

H also do not show that the ACCA erred clearly under (d)(1) in rejecting his arbitrary

override claim as an Eighth Amendment violation.[30]  To begin, Sneed acknowledges

that the "Supreme Court upheld Alabama's judicial override system in *Harris*" under

the Eighth Amendment. Doc. 1 at 20 ¶ 30. While Sneed suggests that this court should

reconsider *Harris* given the Court's later Sixth Amendment holdings in *Apprendi* and

*Ring*, doc. 1 at 20-21, 119 ¶¶ 30, 206, as the ACCA explained in *Sneed Direct II*,

---

[29]*See Gregg*, 428 U.S. at 169, 188 (holding that a death sentence "does not invariably violate the [Eighth Amendment's]" prohibition against "cruel and unusual punishments"); *id.* at 206 (concluding that Georgia's revised sentencing structure, which "focus[ed] . . . on the particularized nature of the crime and . . . characteristics of the individual defendant," addressed "[t]he [prior] basic concern" of "capricious[] and arbitrar[y]" capital punishment); *Godfrey*, 446 U.S. at 423, 433 (holding that the "broad and vague construction of the . . . aggravating circumstance [tied to a murder involving vile, tortious, depraved, or aggravated conduct] . . . violate[d] the Eighth and Fourteenth Amendments"); *Brown*, 479 U.S. at 541 (explaining that the Eighth Amendment requires a capital punishment structure which "prevent[s] . . . arbitrary and unpredictable" death sentences and permits the "introduc[tion] [of] any relevant mitigating evidence"); *Brown*, 479 U.S. at 541-43 (holding that a reasonable understanding of an "instruction not to rely on 'mere sympathy'" did not "interfere[] with the jury's consideration of mitigating evidence" or "violate the provisions of the Eighth and Fourteenth Amendments").

[30]Sneed's additional authorities cited in Claim H include *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion), *Maynard* and *Clemons*. Doc. 1 at 119-20 ¶¶ 206-07. The Supreme Court decided *Harris* years after *Lockett*, *Maynard*, and *Clemons*. Consequently, Sneed's reliance upon those earlier cases to overcome the override holding in *Harris* is a non-starter on AEDPA review.

*Harris* precludes Sneed from obtaining Eighth Amendment relief due to an allegedly arbitrary override decision, 1 So. 3d at 143-44. And nothing in *Ring* or *Apprendi* altered that Eighth Amendment landscape. *Sneed Direct II*, 1 So. 3d at 143. Consequently, the clearly established validity of Alabama's override process in *Harris* forecloses Sneed from demonstrating clearly established Eighth Amendment error on the part of the ACCA.

Likewise, the dissenting opinions in capital cases on denied petitions for a writ of certiorari Sneed references are unhelpful to his override claim under (d)(1)'s legal standards.[31] While the undersigned agrees with them, the constitutional concerns which Justices Marshall and Sotomayor expressed in *Johnson* and *Woodward* are not clearly established law under (d)(1). Thus, neither dissenting opinion overcomes the deference attached to the ACCA's rejection of his override claim.[32]

---

[31]*See* doc. 1 at 18-19 ¶ 27 (quoting *Johnson v. Alabama*, 488 U.S. 876, 876 (1988) (Marshall, J. dissenting for Eighth Amendment reasons)); *id.* at 19-22 ¶¶ 28, 30-31 (quoting *Woodward v. Alabama*, 571 U.S. 1045, 134 S. Ct. 405, 406, 410-11 (2013) (Sotomayor, J. dissenting on Sixth and Eighth Amendment grounds)).

[32]For the same reasons, Sneed's reliance on Justice Breyer's concurring opinion in *Ring* to overcome AEDPA deference on his denied override claim, doc. 1 at 119 ¶ 206, is unavailing.

*vi.*

As for § 2254(d)(2)'s unreasonable factual standard, if a petitioner proves that an adjudicated claim contains a (d)(2) error, then AEDPA deference no longer constrains the habeas court's review. *Jones*, 540 F.3d at 1288 n. 5. In Sneed's case, the (d)(2) evaluation of his override challenge is straightforward. In his petition, Sneed leaves unspecified both the unreasonable factual determination and evidence which substantiates—clearly and convincingly—that fact's objective wrongfulness. 28 U.S.C. § 2254(d)(2), (e)(1).[33] Instead, Sneed simply tracks (d)(2)'s wording conclusively. Doc. 1 at 121 ¶ 210. As a result, Sneed has neither developed nor proven that the ACCA tied the denial of his override claim to an egregious (d)(2) factual error. And without the detachment of deference under (d)(1) or (d)(2), AEDPA bars this court from granting habeas relief on Sneed's adjudicated override allegations.

**d.**

Beyond seeking habeas relief under the Sixth and Eighth Amendments, Sneed challenges the sentencing court's override based upon "fundamental[] unfair[ness],"

---

[33]Here, the court has combined the (e)(1) factual standard with (d)(2)'s. But as explained earlier, the Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)." *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

the absence of due process, and "violat[ions]" of the Fifth and Fourteenth Amendments. Doc. 1 at 18, 119 ¶¶ 27, 206. Sneed's references to due process and the Fourteenth Amendment are consistent with asserting Sixth and Eighth Amendment claims against the State through the incorporation doctrine. But like his briefing on direct appeal, doc. 26-10 at 121, Sneed leaves undeveloped how the override sentence violated his Fifth or independent Fourteenth Amendment rights. Thus, to the extent that Sneed seeks Fifth or free-standing Fourteenth Amendment habeas relief, the court denies those claims for lack of exhaustion, proper pleading, development, and proof.

To close, Sneed fails to detach AEDPA deference from or otherwise substantiate these override allegations.[34]  Thus, the court denies Claims A and H.

**B.**

In Claims B and C, Sneed contends that trial counsel represented him ineffectively in the guilt and penalty phases in violation of the Sixth Amendment.

**1.**

In Claim C of his petition, Sneed asserts that trial counsel performed ineffectively because they did not pursue an intoxication defense to capital murder.

---

[34]Citing mostly *Ring* and *Hurst* in reply, Sneed defends his override allegations on Sixth Amendment grounds. Doc. 31 at 7-8, 11-22. However, Sneed fails to prove clearly established legal or unreasonable factual error under (d)(1) or (d)(2). *See id.*

Doc. 1 at 84. According to Sneed, his intoxicated state at the time of the crime—if developed properly through expert testimony—would have shown that he lacked a "specific and particularized intent to kill" Mr. Terry. Doc. 1 at 85 ¶ 139. Sneed asserts two other guilt-phase *Strickland* subclaims pertaining to trial counsel's omitted objections to alleged prosecutorial misconduct. Doc. 1 at 84 ¶ 137; *id.* at 93, 95; Doc. 31. But Sneed failed to develop these claims. For example, while Sneed discusses intoxication in the context of trial counsel's ineffective mitigation in his reply,[35] Sneed makes no effort to refute Respondent's position that the ACCA rejected his guilt-phase *Strickland* subclaims error-free under AEDPA, *cf.* doc. 31 at 51 ("The State has failed adequately to rebut Mr. Sneed's claim of ineffective assistance of counsel at the penalty phase.") (emphasis and capitalization omitted). Accordingly, as reshaped through the parties' briefing, Sneed has abandoned the pursuit of habeas relief attributable to trial counsel's alleged ineffective assistance in the guilt phase.[36] Alternatively, Sneed has not proven extreme error in the ACCA's adjudication of his guilt-phase *Strickland* subclaims. Consequently, AEDPA's overriding deference to the Alabama courts' collateral resolution of these ineffective assistance allegations

---

[35] *See, e.g.*, doc. 31 at 95 (arguing that "available expert testimony from an addiction/intoxication expert . . . would have had strong mitigating value").

[36] *See* n. 22 above.

precludes this court from awarding habeas relief. 28 U.S.C. § 2254(d); *see Tharpe*, 2014 WL 897412, at *3 n. 4 (pointing out that obtaining habeas relief on an adjudicated claim requires a petitioner to prove an AEDPA exception under (d)(1) or (d)(2)).

## 2.

The court turns now to the ACCA's denial of Sneed's *Strickland* penalty-phase subclaims in Claim B—a primary focus of his petition and reply. Sneed divides Claim B into several subclaims. Specifically, Sneed faults trial counsel for overlooking available lay witnesses in an unreasonably curtailed investigation—subclaim B.1; not calling known and available lay witnesses—subclaim B.2; failing to retain available expert witnesses in the areas of mental health, addiction, and intoxication—subclaims B.3 and B.4; omitting evidence of his remorse for the offense—subclaim B.5; and not introducing governmental reports with corroborating references to his mental disorders, intoxication, and remorse—subclaim B.6.[37]  Doc. 1 at 43, 51, 57, 67, 71, 76. In his last subclaim B.7, Sneed argues that the Alabama courts failed to consider

---

[37]Within his guilt-phase subclaims, Sneed asserts that trial counsel should have objected to the prosecutor's view that cooperation was an unproven mitigating circumstance. Specifically, Sneed argues that trial counsel left unchallenged the prosecutor's "personal opinion" that Sneed's post-arrest confession was insufficient to show mitigating cooperation. Doc. 1 at 94 ¶ 154. Sneed does not revisit this issue in reply. *See generally* doc. 31. Consequently, Sneed has abandoned this penalty-phase subclaim—included in Claim C—as a basis for habeas resentencing relief.

the cumulative prejudicial impact of trial counsel's professional errors under *Strickland*'s reasonable probability assessment. Doc. 1 at 79.

### a.

Consistent with his habeas allegations in subclaim B.2, Sneed alleged in his Rule 32 petition that trial counsel failed to present several known lay witnesses who could have provided helpful mitigating testimony. Doc. 26-15 at 165-176 ¶¶ 146-97. The circuit court denied these allegations, referencing mostly Alabama Criminal Procedure Rule 32.7(d)—Alabama's postconviction summary dismissal rule—and occasionally adding Alabama Rules 32.3 and 32.6(b)—Alabama's collateral pleading rules. Doc. 26-19 at 154-58.[38]  In affirming the circuit court, the ACCA referenced Sneed's abandonment of allegations, incomplete briefing under Alabama Appellate Procedure Rule 28(a)(10), and deficient pleading under Rules 32.3 and 32.6(b). Doc.

---

[38]Under Rule 32.7(d), a circuit court "may either dismiss the petition or grant leave to file an amended petition" upon a "determin[ation] that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings." Ala. R. Crim. P. 32.7(d). Rule 32.3 addresses the parties' respective burdens and provides that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief" and "disproving" any defense of preclusion alleged by the State. Ala. R. Crim. P. 32.3. Finally, Rule 32.6(b) requires a petitioner to present for each Rule 32 claim "a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Ala. R. Crim. P. 32.6(b). Consequently, "bare allegation[s]" and mere conclusions of law that a constitutional violation occurred will not "warrant any further proceedings." *Id.*

26-19 at 97-101. The court discusses the scope of Rule 28(a)(10) and then addresses the ACCA's rationale in more detail below.

*i.*

Rule 28(a) governs "[b]riefs of the appellant/petitioner" and requires certain contents organized in a specific order. Ala. R. App. P. 28(a) (italics omitted). Subpart 10 of Rule 28(a) addresses the argument section of an appellate brief and describes it as "containing the contentions of the . . . petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Rule 28(a)(10) refers also to acceptable sources for formatting citations and states that "[c]itations shall reference the specific page number(s) that relate to the proposition for which the case is cited." *Id.*

As previously discussed in the standards of review section, state-barred procedural default applies on habeas review when three requirements are met. Here, the parties dispute satisfaction of the third requirement—whether Rule 28(a)(10) is "adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

91

In *Ex parte Borden*, 60 So. 3d 940 (Ala. 2007), the Alabama Supreme Court recognized that not all applications of Rule 28(a)(10) are firmly established under Alabama law. Referencing *Borden* and other cases in his habeas reply brief, Sneed maintains that his collateral appeal brief provided notice of his arguments and supporting legal authority "in the aggregate." Doc. 31 at 37-41. Thus, Sneed contends that the ACCA's reliance upon Rule 28(a)(10) in the denial of this collateral claim will not support state-barred procedural default on habeas review. Doc. 31 at 40-41. To better understand how Alabama appellate courts apply Rule 28(a)(10), the court examines *Borden* contextually.

In *Borden*, the petitioner sought postconviction relief due to ineffective assistance of counsel. 60 So. 3d at 944. The trial court summarily dismissed those Rule 32 claims and the petitioner appealed. *Id.* In his brief to the ACCA, the petitioner alleged "22 pages of facts addressing why the trial court [had] erred." *Id.* The petitioner included also "11 pages of argument . . . [and] some 25 citations to case law, along with explanations and quotations from the cited cases." *Id.* The ACCA rejected the petitioner's appeal on the basis that his brief did not comply with Rule 28(a)(10). *Borden*, 60 So. 3d at 944. The Alabama Supreme Court granted certiorari review on whether the ACCA had "correctly held that [the petitioner] failed to

comply with Rule 28(a)(10) . . . , and thereby waived his ineffective-assistance-of-counsel claims." *Borden*, 60 So. 3d at 942.

The Alabama Supreme Court reversed, holding that the petitioner's brief was compliant with Rule 28(a)(10) and that the petitioner had "not waive[d] his claims of ineffective assistance of counsel." *Borden*, 60 So. 3d at 944. In rejecting the ACCA's procedural rationale, the Alabama Supreme Court observed that "another attorney" may have briefed the argument "differently." *Id.* Still, the Court concluded that the petitioner's "brief [wa]s sufficient to apprise the [ACCA] of [his] contentions with regard to his ineffective-assistance-of-counsel claims." *Id.* The Court noted too that "waiver of an argument for failure to comply with Rule 28(a)(10) [was applicable] . . . to those cases" in which a petitioner presented "no argument" and provided "few, if any, citations to relevant legal authority" in the brief. *Id.* The Court explained that under that noncompliant scenario, a petitioner's argument amounted to "undelineated general propositions," which thwarted meaningful appellate review. *Id.* (citing collected cases); *see, e.g.*, *Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1092 (Ala. 2007) (explaining that a "lone citation to a general principle of law without specific relevance to [a claim] does not meet the requirements of Rule 28(a)(10)").

Against this backdrop, the court understands that whether an appellate court's reliance on Rule 28(a)(10) is firmly established for habeas purposes will depend on

how developed the petitioner's brief is on the applicable claim. Put differently, if an appellate court denied a claim because the petitioner's brief lacked argument or contextualized authority, then that limited, but firmly-established, application of Rule 28(a)(10) will support state-barred procedural default on habeas review. But an appellate court's reliance on Rule 28(a)(10) when the petitioner gave adequate notice of his claim will fall outside the firmly-established range of application and a defense based upon state-barred procedural default will fail. *See, e.g.*, *Gaines v. Price*, No. 2:15-CV-1822-VEH-TMP, 2017 WL 2296962, at *21 (N.D. Ala. May 2, 2017) (declining to apply state-barred procedural default on habeas review because "the brief . . . sufficiently supplied facts and authority that would have allowed the [state] appellate court to address the issue on the merits"), *report and recommendation adopted*, 2017 WL 2289105 (N.D. Ala. May 25, 2017).

### ii.

Turning back to the ACCA's discussion of Sneed's collateral allegations which correspond with subclaim B.2, as a threshold matter to the Rule 28(a)(10) analysis, the ACCA divided Sneed's postconviction known-witness allegations into eight categories. Doc. 26-19 at 97. Referring to Sneed's collateral brief, the ACCA determined that Sneed had abandoned most of those categories except for "lay testimony about his unstable, impoverished, and traumatic childhood and behavioral

problems." Doc. 26-19 at 97 & n. 1; *see also* doc. 26-17 at 86 (Sneed's argument for resentencing on collateral appeal). Because of Sneed's more narrow discussion of the known-witness allegations on appeal, the ACCA "deemed" "all other aspects of this claim abandoned."[39]  Doc. 26-19 at 97 n. 1. Alternatively, the ACCA concluded that Sneed had waived the remaining allegations by failing to comply with Rule 28(a)(10) on those unpresented allegations. Doc. 26-19 at 97 n. 1.

The ACCA focused then on the unabandoned category of omitted testimony—Sneed's abusive childhood and troubled behavioral background from known lay witnesses. Doc. 26-19 at 97. The ACCA noted Sneed's observation in his brief that the circuit court had dismissed these allegations "largely" for cumulative evidence or lack of prejudice reasons. Doc. 26-17 at 86. The ACCA pointed out that Sneed then narrowed the scope of his Rule 32 appellate challenge to the circuit court's cumulative assessment based upon Ms. Terrell's testimony. Doc. 26-19 at 97.

---

[39]The remaining seven categories the ACCA identified as abandoned were that Sneed:

2) . . . was raped as a child; 3) . . . had behavioral problems; 4) . . . ha[d] positive and endearing qualities; 5) . . . protect[ed] others; 6) . . . ha[d] artistic talents; 7) . . . [had] f[a]ll[en] in with a bad crowd; and 8) . . . ha[d] matured and found God since being in prison.

Doc. 26-19 at 97.

Specifically, Sneed argued in his brief that Ms. Terrell's reference to "entries about [his] [terrible] upbringing" were not as compelling as "the first-hand testimony about his terrible upbringing that his childhood friends . . . could have provided." Doc. 26-17 at 86. To support that contention, Sneed relied upon the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Penalty Cases (the "Guidelines"). Doc. 26-17 at 86. Sneed mentioned additionally the Supreme Court's discussion of the Guidelines in the analysis of an ineffective mitigation investigation in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Sneed did not raise other cumulative-evidence concerns in briefing this *Strickland* subclaim.

Against this backdrop, the ACCA concluded that even Sneed's unabandoned argument tied to prejudice "from [the] decision to present mitigating evidence through [Ms. Terrell] rather than lay witnesses . . . [did not] comply with Rule 28(a)(10)." Doc. 26-19 at 98. The ACCA noted that Sneed had not explained how trial counsel's conduct fell below the Guideline's standards or why a decision to rely upon Ms. Terrell's testimony could not have been a strategic choice. *Id.* at 100. The ACCA observed that Sneed had offered nothing to dispute the circuit court's collateral finding that "Ms. Terrell was credible and persuasive." *Id.* (internal quotation marks omitted). According to the ACCA, these gaps in Sneed's collateral

brief meant that he had waived the unabandoned category of allegations under Rule 28(a)(10)'s requirements. Doc. 26-19 at 101.

"It is a dominant theme of the Supreme Court case law . . . that a federal habeas petitioner shall not be denied federal review of a federal constitutional claim on the basis of an asserted state procedural ground that is manifestly unfair in its treatment of that claim." *Spencer v. Kemp*, 781 F.2d 1458, 1470 (11th Cir. 1986) (en banc). This means that to benefit from state-barred procedural default on habeas review, Respondent bears the burden of meeting the firmly established requirement. As explained in *Borden*, Rule 28(a)(10) requires adequate—not precise—notice of an appellate claim. Given *Borden*'s holding, Respondent has not shown that the ACCA rejected the unabandoned category of this subclaim under a firmly established application of Rule 28(a)(10). Doc. 23 at 16-17 ¶ 23. This is evident by the fact that the ACCA was able to analyze this particular *Strickland* argument on the merits. Consequently, the court agrees with Sneed that he presented sufficient argument to the ACCA to prevent the application of state-barred procedural default to the unabandoned portion of this subclaim on habeas review.

### *iii.*

Because state-barred procedural default does not apply, the court turns to the ACCA's alternative merits-based assessment. Here, the ACCA agreed with the

circuit court "that counsel will not be held ineffective for failing to present cumulative evidence." Doc. 26-19 at 98. The ACCA restated some of the same points discussed in the Rule 28(a)(10) analysis, including that trial counsel may have chosen to rely solely on Ms. Terrell for strategic reasons. *Id.* at 101. The ACCA noted too that Sneed had failed to allege facts establishing *Strickland* prejudice. *Id.* These factual deficiencies, which the ACCA identified, included allegations establishing that the "lay witnesses would have been more credible than [Ms.] Terrell or that the judge or jury failed to consider his mitigating evidence because . . . [the testimony] [came] through a social worker." *Id.*

In his habeas reply, Sneed challenges the ACCA's reliance upon cumulative evidence as a reason to affirm the circuit court's decision. *See* doc. 31 at 9 ("Respondent's primary response . . . is that there was some evidence on these issues and the omitted evidence was merely cumulative."). Sneed contends generally that the Alabama courts reached "a decision that was contrary to or involved an unreasonable application of . . . Supreme Court [precedent] and that was based on an unreasonable determination of the facts." *Id.* But Sneed has not pointed to Supreme Court decisions or evidence in the state court proceeding which substantiates his AEDPA contentions with respect to the unabandoned portion of this subclaim.

For example, Sneed does not address the alleged unreasonableness of the ACCA's *Strickland* performance point that trial counsel could have made a strategic choice to introduce information about his tumultuous upbringing and destructive behaviors through Ms. Terrell. Likewise, Sneed does not discuss why the ACCA erred unreasonably in reaching its *Strickland* prejudice conclusion. And on this record, the sentencing court's identification of five mitigating factors about Sneed's arduous life attributable to Ms. Terrell's testimony demonstrates the reasonableness of the ACCA's conclusion that no reasonable probability of a different sentencing outcome existed if lay witnesses had testified about Sneed's difficult childhood and behavioral problems. Doc. 1 at 138. Thus, Sneed has not demonstrated a right to habeas relief on the unabandoned part of this subclaim B.2 which the ACCA addressed, alternatively, on the merits.

Returning to those allegations which the ACCA rejected as abandoned, neither party focuses on that procedural basis in the habeas filings applicable to this subclaim. Docs. 1 at 51-56 ¶¶ 76-86; 23 at 16-17 ¶ 31; 24 at 28-29; *see also, e.g.*, *Waldrop v. Johnson*, 77 F.3d 1308, 1318 (11th Cir. 1996) ("agree[ing] with the district court that th[e] claim [wa]s defaulted" on habeas review because the petitioner had abandoned it on appeal to the ACCA). Accepting that the ACCA applied abandonment in a firmly established manner, then Sneed has the burden to overcome this procedural

default on habeas review, which he has failed to do. Alternatively, even if the ACCA overstepped in the application of abandonment on collateral appeal, Sneed—in his silence on habeas review—has waived a right to challenge the soundness of that procedural conclusion. Additionally, the ACCA's reliance on Rule 28(a)(10) as another procedural bar to those seven undeveloped categories in Sneed's brief falls within the firmly established scope of that state rule.[40]

For these reasons, state-barred procedural default precludes habeas relief on the remainder of this subclaim.

### b.

Moving to subclaim B.6, Sneed argues that trial counsel provided ineffective assistance by failing to introduce two known governmental reports, which contained "powerful mitigation evidence." Doc. 1 at 76 ¶ 124. One document "was the Outpatient Forensic Evaluation Report of Dr. Lawrence Maier, [a] licensed forensic psychologist retained by the State"—the Maier Report.[41] *Id.* at 77 ¶ 126. The other

---

[40]*Cf. Ferguson v. Allen*, No. 3:09-CV-0138-CLS-JEO, 2014 WL 3689784, at *58 (N.D. Ala. July 21, 2014) ("Thus, the [ACCA] did not arbitrarily apply Rule 28(a)(10) to [the petitioner]'s footnote reference to all 141 pages of his Rule 32 petition."), *vacated in part on unrelated grounds*, 2017 WL 2774648 (N.D. Ala. June 27, 2017), *appeal filed* July 22, 2020.

[41]Sneed fails to provide a corresponding evidentiary citation to the Maier Report. And the court's search of the electronic record for the Maier Report proved unsuccessful. Based on Sneed's reply brief, the court understands that Dr. Maier addressed Sneed's competency to stand trial in the Maier Report and that "all counsel and the [circuit] court" received a copy of the document in April 1994. Doc. 31 at 96 (internal quotation marks omitted).

document was the 1995 Alabama Board of Pardons and Paroles' presentencing report on Sneed—the 1995 PSR.[42] *Id.* at 78 ¶ 127; Doc. 27-23 at 24-31. In response to Respondent's assertion that "Sneed did not raise [this contention] on collateral appeal" to the ACCA, doc. 23 at 26 ¶ 27; doc. 24 at 59, Sneed explains that he made "repeated[] reference[s]" to the Maier Report in his appellate brief, doc. 31 at 42.[43] Sneed adds that he referred to the 1995 PSR's documentation "of his consistent remorse," doc. 31 at 43; doc. 26-17 at 88, that the ACCA addressed both documents in the merits-based evaluation of his subclaim that trial counsel failed unreasonably to introduce evidence of his remorse, doc. 31 at 43; doc. 26-19 at 101-02, and that the ACCA never considered his "other contentions" about intoxication and mental illness as documented in the Maier Report, doc. 31 at 43. Sneed continues further that the ACCA did not "hold that [his] contentions relating to the [Maier Report and 1995 PSR] and the sub-claims they support [we]re procedurally defaulted." *Id.*[44]

---

[42]After Sneed's second capital conviction in 2006, the Alabama Board of Pardons and Paroles prepared a new PSR. Doc. 26-3 at 24-29.

[43]*See* doc. 26-17 at 53 (discussing the Maier Report in the context of a guilt-phase *Strickland* claim); *id.* at 64, 72 (mentioning the Maier Report in support of an unreasonable investigation subclaim); *id.* at 89 n. 23, 92 (noting the Maier Report's references to Sneed's remorse).

[44]Given Sneed's reply, the court handles Respondent's defense of unexhausted procedural default in two different ways. One, part of this subclaim overlaps with subclaim B.5—trial counsel's failure to introduce the Maier Report and the 1995 PSR as evidence of his remorse. Consequently, the court will consider the issue of unexhausted procedural default with respect to these records when addressing subclaim B.5.

But missing from Sneed's references to his appellate brief is any collateral argument that trial counsel should have introduced the Maier Report or the 1995 PSR for reasons beyond his remorse. And Sneed's discussion of the Maier Report in the context of other *Strickland* subclaims did not fairly present a theory that trial counsel failed unreasonably to introduce that document for other mitigating reasons. Consequently, Respondent observes correctly that unexhausted procedural default bars habeas relief on the intoxication and mental illness portions of subclaim B.6.

### c.

In subclaim B.7, Sneed asserts that the Alabama courts "disregard[ed]" Supreme Court and Eleventh Circuit precedent in analyzing *Strickland* prejudice in the penalty phase. Doc. 1 at 79 ¶ 129. Citing *Sears v. Upton*, 561 U.S. 945, 955-56 (2010) (per curiam), Sneed argues that cumulative prejudice under *Strickland*'s second prong is "a required method of judicial analysis" and "not a 'claim.'" Doc. 1 at 80 ¶ 130. Sneed continues that cumulative prejudice "need not be pled" and "cannot be waived." *Id.*

In his collateral attack in state court, Sneed argued that the circuit court failed to consider cumulative prejudice in denying his Rule 32 petition and instead adopted a "piecemeal" approach. Doc. 26-17 at 36-38; *see id.* at 36 ("The circuit court refused to evaluate counsel's performance as a whole in order to make a determination as to

cumulative prejudice."). Sneed cited several cases, including guilt- and penalty-phase authority. Doc. 26-17 at 37. The ACCA rejected Sneed's argument procedurally and on the merits. Doc. 26-19 at 79-81. Procedurally, the ACCA determined that Sneed had not preserved the penalty-phase argument for appellate review. Doc. 26-19 at 80. Specifically, the ACCA concluded that Sneed's Rule 32 cumulative prejudice claim in the guilt phase was "distinct" from challenging "the circuit court's handling of all [*Strickland*] claims." Doc. 26-19 at 80. The ACCA gave no explanation how Sneed could have anticipated and preserved an issue in his Rule 32 petition that arose in the circuit court's denial of that petition.

Relevant here, however, Sneed combined both his guilt- and penalty-phase claims into one cumulative-prejudice argument in his collateral appeal. Doc. 26-17 at 36-38. And Sneed has not identified where he ever presented to the ACCA the more particularized arguments about the cumulative prejudice error the circuit court made in the penalty-phase assessment of his new mitigating evidence. To that extent, unexhausted procedural default arguably applies to this subclaim. Still, the court will analyze *Strickland* prejudice consistent with the cumulative framework dictated by Supreme Court and Eleventh Circuit precedent if Sneed shows deficient performance on his remaining penalty-phase allegations—subclaims B.1 and B.3-B.5. *See, e.g.*, *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1278 (11th Cir. 2016)

(detaching AEDPA deference because the ACCA did not "consider[] what would be the combined effect of all mitigating evidence in producing a different outcome at sentencing" under clearly established *Strickland* precedent).

The court moves now to Sneed's expert witness allegations in subclaims B.3 and B.4, which the ACCA decided on the merits.

### d.

In subclaim B.3, Sneed asserts that trial counsel ineffectively failed to retain a mental health expert even though "their own investigator had . . . [made that recommendation] . . . in 2003, more than two years before trial." Doc. 1 at 57 ¶ 87. Sneed identifies Dr. Stan Brodsky, "a mental health professional," as that postconviction expert. Doc. 1 at 58 ¶ 90. According to Sneed, Dr. Brodsky would have offered the following mitigating health information:

> a.      Following a comprehensive mental health assessment of Mr. Sneed and based on his medical history, Mr. Sneed suffered from major mental illnesses; to wit: Post-Traumatic Stress Disorder (Chronic), and Major Depressive Disorder (Chronic), arising from a childhood history of being beaten by his father and being raped at age 9 by a stranger. . . .

> b.      These types of illnesses negated Mr. Sneed's capacity to form a specific particularized intent to kill, which is required for capital murder.

> c.      The medical records of Mr. Sneed and his immediate family members ([his] mother[,] Sharon and younger brother[,] Avery) show a systemic family pattern of major mental illness in all three individuals. . . .

      d.      The medical records show that Mr. Sneed experienced 'hearing voices.'. . .

      e.      The medical records show that Mr. Sneed tried to commit suicide as a teenager. . . .

      f.      The medical records show that Mr. Sneed would talk to himself, beat walls, and yank out faucets until staff sedated him with the antipsychotic drug Thorazine. . . .

      g.      The medical records show that Mr. Sneed had significant in-patient hospitalizations: at Keller Partial Hospitalization Program (3 months), Norton's Children's Hospital (nearly one year), Cardinal Treatment Center (seven months), and the Psych unit at Humana Hospital – University of Louisville (at least two weeks).

      h.      Mental health professionals at the institutions diagnosed him, variously, with: borderline personality disorder, dysthymic disorder (akin to major depression), and obsessive-compulsive disorder. The assessments describe Mr. Sneed as 'anxious and depressed;' as having 'anxiety, depression;' 'evidence of depression and [an] inability to cope . . . ;' '. . . feel[ings] [of] intense insecurity and [a] lack of affection from others . . . ;' '. . . and . . . many unmet dependency needs."

Doc. 1 at 59-60 ¶ 91 (citations omitted). According to Sneed, the jury and the sentencing court never heard about the mitigating information contained in subparts a, c-f. *Id.* at 59 ¶ 91.

### *i.*

     In his Rule 32 petition, Sneed combined his *Strickland* mental health and addiction expert allegations. Doc. 26-15 at 182-86 ¶¶ 215-25. Additionally, Sneed

incorporated into the mental health expert subclaim allegations about his mental health medical records, which formed the basis of Dr. Brodsky's mental illness opinion. *See* doc. 26-15 at 186 ¶ 224 (incorporating by reference *id.* at 176-82 ¶¶ 198-214).

The Rule 32 court summarily denied the mental health expert subclaim as refuted by the record. Doc. 26-16 at 161. In particular, the court noted that trial counsel had retained a psychologist, Dr. Rosenzweig, who testified about Sneed's mental health in the penalty phase. *Id.* For its part, the ACCA affirmed the Rule 32 court's dismissal of this subclaim using a different rationale. According to the ACCA's assessment, "[m]uch of the testimony Sneed argue[d] could have been presented by a qualified mental health expert would have been cumulative to the testimony presented during the penalty phase." Doc. 26-19 at 92. After drawing this conclusion, the ACCA acknowledged one noncumulative area—"neither Dr. Rosenzweig nor Ms. Terrell testified that Sneed was mentally ill at the time of the crime." *Id.*

Still, the ACCA rejected that allegation as pled insufficiently. *Id.* The ACCA noted that "Sneed [had] failed to plead the symptoms he suffered as a result of PTSD at the time of the crime, how PTSD constituted an 'extreme mental or emotional disturbance' . . . , or how PTSD impaired his 'capacity . . . to appreciate the

criminality of his conduct.'" *Id.* (citing Ala. Code § 13A-5-51(2), (6)). The ACCA concluded that "[t]he bulk of [this] subclaim . . . was comprised of cumulative testimony, and those portions . . . that were not cumulative were [pled] insufficiently." Doc. 26-19 at 93. The ACCA did not address *Strickland*'s deficient performance prong.[45]

## ii.

Before undertaking the § 2554 analysis, the court addresses a threshold issue regarding Sneed's allegations on collateral versus habeas review. Citing Alabama caselaw, the ACCA noted that it did not consider "referenced evidence" alleged elsewhere in Sneed's Rule 32 petition in deciding the merits of this expert subclaim. Doc. 26-19 at 91 n. 8. Instead, the ACCA indicated that Sneed should have reasserted that same medical information within the subclaim pertaining to Dr. Brodsky rather than seeking collateral relief by incorporating other parts of the petition. *Id.*; *see also Coral v. State*, 900 So. 2d 1274, 1284 (Ala. Crim. App. 2004), *overruled on other grounds by Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005); *Jackson v. State*, 133 So. 3d 420, 451 (Ala. Crim. App. 2009). As a result, the ACCA did not consider the

---

[45]In a situation where, as here, "there is no square finding from the trial [or appellate] court about whether counsel satisfied *Strickland* performance[,] [t]he most we can say is that [the court] raised the question, but then disposed of [the petitioner]'s claim by finding that he failed to establish *Strickland* prejudice." *Kokal*, 623 F.3d at 1341-42.

impact of mitigating information that supported Dr. Brodsky's mental illness opinion such as Sneed's attempted suicide and family history of mental illness.

The court respectfully disagrees with the ACCA. First, *Coral* and *Jackson* did not involve the issue of incorporating ineffective assistance allegations by reference. Second, the ACCA did not assert that Sneed violated an Alabama procedural rule by incorporating allegations about his mental health medical evidence which Dr. Brodsky reviewed. Finally, Respondent does not raise the issue that state-barred procedural default applies because of Sneed's incorporated allegations on collateral review or demonstrate the firmly established nature of such a defense. *See generally* doc. 23 at 19-20 ¶ 24; doc. 24 at 41-45. Consequently, the court will not exclude from the habeas analysis those Rule 32 allegations which Sneed incorporated—with a clear reference—on collateral review.

### *iii.*

In reviewing Sneed's claim, the court seeks guidance from the Eleventh Circuit's *Daniel* decision in structuring the analysis. The petitioner in *Daniel*, like Sneed, challenged the ACCA's summary dismissal of his ineffective assistance allegations pertaining to the penalty phase. *Id.* at 1261. The Eleventh Circuit explained that the petitioner's habeas appeal required it to "answer two questions." *Id.* The "[f]irst[] [was] whether [the petitioner]'s second amended Rule 32 petition

and its attached exhibits pleaded enough specific facts that, if proven, amount[ed] to a valid penalty phase ineffective assistance of counsel claim." *Id.* If the answer to the initial inquiry was "in the affirmative," then the second question was "whether the [ACCA]'s decision to the contrary was unreasonable under § 2254(d)." *Daniel*, 822 F.3d at 1261. Thus, *Daniel* directs that the court determine first whether a petitioner's allegations are sufficient to state a *Strickland* ineffective assistance claim and, if yes, the impact of AEDPA deference.

### iv.

Here, the state court record establishes unambiguously that Sneed has no viable *Strickland* subclaim tied to Dr. Brodsky because trial counsel's documented pretrial actions refute Sneed's deficient performance allegations. And no additional development through discovery or an evidentiary hearing will change this court's first prong assessment. Specifically, the crux of Sneed's deficient performance allegations is that trial counsel failed or waited unreasonably to retain Dr. Brodsky. Doc. 1 at 57-58 ¶¶ 87, 91. Sneed argues that trial counsel knew the importance of retaining Dr. Brodsky from a mitigation specialist, Cyrus T. Johnston. *Id.* at 57 ¶ 87; Doc. 26-9 at 77 ¶ 25; Doc. 26-9 at 57 ¶ 10. Sneed adds that he would have been able to show the existence of Alabama's extreme mental disturbance and diminished mental capacity mitigating factors through Dr. Brodsky's mental health assessment and expert

testimony. Doc. 1 at 57-60 ¶¶ 89-91. And with those additional statutory factors in play, Sneed contends that he meets *Strickland*'s reasonable probability test.

Sneed fails to consider the context of the state court record and his ability to actually prove deficient performance. Specifically, the state court record confirms that trial counsel tried more than once with the circuit court to secure the necessary funding to retain Dr. Brodsky. In December 2004, trial counsel asked for the approval of $7,500 to hire Dr. Brodsky. Doc. 26-9 at 14-23. Within thirty days of the trial court's denial of that request, counsel moved for reconsideration. Doc. 26-9 at 24-29, 61-62. In mid-January 2005, the trial court granted trial counsel's request partially and approved additional expert funding in the amount of $3,500. Doc. 26-9 at 63.

Trial counsel followed the partial relief with an ex parte motion to continue filed near the end of January. *Id.* at 65-72. In that requested continuance, counsel explained that they would be unable to retain Dr. Brodsky without the full $7,500. *Id.* at 71 ¶ 10. Counsel attached to their request Mr. Johnston's affidavit in which he "identifie[d] and explaine[d] the need for additional experts," including Dr. Brodsky. *Id.* at 70 ¶ 4; Doc. 26-9 at 73-85. Mr. Johnston acknowledged the existence of Ms. Terrell's psychosocial report on Sneed, doc. 26-9 at 79 ¶ 28, but maintained that "[i]t [wa]s imperative" for Sneed to "receive a comprehensive psychological evaluation" from Dr. Brodsky, *id.* at 81 ¶ 32.

The court agreed to continue the trial but denied the request "for further mitigation expert assistance and money." Doc. 26-9 at 86. As reasoning, the circuit court noted its approval of $3,500, as well as the "over $10,000" approved generally "for mitigation expert assistance." *Id.* The court found that counsel's "request for more funds . . . [was] unreasonable" and stated that "no further sums [would] be approved at this time." *Id.* The court offered to "enter an order for mental evaluation to be performed by the State," if Sneed "fe[lt] the need for further psychological examination," and set a deadline for that option. *Id.*

Based on this record, trial counsel made reasonable efforts to secure the expert testimony of Dr. Brodsky. Counsel's inability to persuade the court to allow more funding does not establish deficient performance. Moreover, Sneed has not alleged that trial counsel failed unreasonably to take advantage of another source of money that could have satisfied Dr. Brodsky's financial requirements.

As for the argument that trial counsel waited too long to respond to Mr. Johnston's "preliminary mitigation strategy" outlined in July 2003 and his repeated follow-up efforts to counsel, Sneed has not linked that alleged error to trial counsel's inability to retain Dr. Brodsky. According to the timeline which Mr. Johnston provided in his affidavit, as of December 2003, trial counsel remained hopeful that Sneed would agree to plea. Doc. 26-9 at 76 ¶ 19. And when Mr. Johnston informed

trial counsel that Sneed wanted "to proceed with the experts," *id.*, counsel obtained a continuance and $3,000 to retain Ms. Terrell in February 2004. *Id.* at 77 ¶ 20.

Trial counsel followed the hiring of Ms. Terrell with motions to secure Dr. Brodsky beginning in December 2004. The circuit court reminded trial counsel in the January 2005 order applicable to Dr. Brodsky that "that the trial was reset for February 28, 2005, after receiving assurances . . . that everyone was ready" and approving expert funds for Ms. Terrell. Doc. 26-9 at 63. But, importantly for *Strickland* deficient performance purposes, the circuit court did not reduce trial counsel's requested funding for Dr. Brodsky because of an unreasonable delay. Instead, the circuit court noted that trial counsel's request was "substantially more money . . . but with another expert." *Id.* The court added that Sneed's "rights to a fair trial, due process, etc. had already been considered when prior expert assistance was approved and funds allocated." *Id.* Finally, the court emphasized that the trial would proceed as scheduled with the retention of Dr. Brodsky. *Id.*

Thus, the underlying state court documents do not show that trial counsel's alleged delay in preparing an expert motion prevented them from using Dr. Brodsky as a mental health expert. Instead, financial constraints prevented counsel from using Dr. Brodsky. Therefore, the court determines on habeas review that the state court record refutes Sneed's allegations of deficient performance with respect to Dr.

Brodsky. And without cognizable deficient performance, Sneed's argument that the state courts evaluated prejudice in isolation and contrary to clearly established *Strickland* precedent in failing to consider Dr. Brodsky's anticipated mental health testimony is of no consequence.[46]

**e.**

The court reaches a similar deficient performance conclusion with respect to subclaim B.4, i.e., Sneed's contention that trial counsel proved ineffective by failing to secure "available expert testimony from an addiction/intoxication expert like Dr. Greg Skipper." Doc. 1 at 67 ¶ 108. Again, Sneed points to the mitigation specialist's identification of the need to retain an addiction expert and the specialist's efforts to communicate with trial counsel about that mitigating strategy as early as July 2003. Doc. 1 at 67 ¶ 108. As Sneed puts it, trial counsel disregarded "th[e] advice from their own experienced investigator" and "never asked the court for funds to hire an addiction expert." *Id.* (internal quotation marks omitted).

This factual statement is consistent with the state court record—trial counsel did not seek expert funds to retain an addiction expert. Sneed ignores however that

---

[46]Thus, the court does not reach *Strickland* prejudice or the reasonableness of the ACCA's assessment of that prong given Dr. Brodsky's postconviction opinion that Sneed was mentally ill from post-traumatic stress disorder at the time of the offense versus Dr. Rosenzweig's more speculative opinion about his mental health.

the trial court was unwilling to lift its prior limitation on additional expert funding for a mental health expert in February 2005. In doing so, Sneed does not allege how trial counsel could have reasonably requested funding for another expert witness given the circuit court's denial of full funding for Dr. Brodsky. Likewise, Sneed's allegations do not account for trial counsel's possible reasonable reluctance to press the trial court for more expert funding in light of prior motions and the outcome in the February 2005 order.

Consequently, Sneed's allegations do not overcome the presumption that trial counsel did not perform unreasonably in failing to move for funds to retain Dr. Skipper—an action which trial counsel could have determined was futile and even detrimental under the circumstances. And Sneed has not alleged enough to show that trial counsel's failure to file another funding motion, rather than the circuit court's concerns about excessive expert funding, was the "[b]ut for" reason Dr. Skipper was not an expert witness. Doc. 1 at 67 ¶ 108 (internal quotation marks omitted).

Because of Sneed's first prong failing on the Dr. Skipper subclaim, ending the *Strickland* analysis here is appropriate under *Daniel*. And without cognizable deficient performance, Sneed's argument that the state courts evaluated prejudice in isolation and contrary to clearly established *Strickland* precedent in failing to consider Dr. Skipper's anticipated addiction testimony is of no consequence.

114

**f.**

Sneed contends in subclaim B.5 that trial counsel provided ineffective assistance by failing to introduce available evidence of his "long-standing remorse" over Mr. Terry's murder.[47]  Doc. 1 at 71 ¶ 114.

**i.**

Procedurally, Respondent asserts "Sneed waited until he filed his brief on collateral appeal to raise specific facts about this subclaim." Doc. 24 at 55. Citing Alabama cases, Respondent references a "well-settled" principle that "an appellate court will not consider facts or arguments raised for the first time on appeal." *Id.* According to Respondent, the gap between Sneed's limited Rule 32 allegations in his petition and the more-developed facts asserted in his collateral brief means that Sneed is precluded from relying on those newer factual assertions on habeas review. Doc. 24 at 55-56. Thus, Respondent invokes state-barred procedural default.

In its mostly merits-based decision, the ACCA mentioned one procedural issue tied to Sneed's collateral brief. Specifically, the ACCA pointed out that Sneed had identified, for the first time on appeal, a specific study which "show[ed] that jurors

---

[47]The Supreme Court has noted—in a capital case involving a jury instruction challenge— that "remorse, which by definition can only be experienced after a crime's commission, is something commonly thought to lessen or excuse a defendant's culpability." *Brown*, 544 U.S. at 142-43.

in capital murder cases are often moved by a defendant's genuine expression of remorse." Doc. 26-19 at 102 (internal quotation marks omitted). The ACCA noted that "Sneed's attempt to supplement his [Rule 32] pleading through his brief on appeal . . . [was improper] because . . . [he had not] included [that information] in his petition." *Id.* n. 11. But the ACCA did not exclude from consideration anything else within Sneed's brief as procedurally noncompliant.

Sneed asserts correctly that the ACCA did not rely on his "purported introduction of new facts and arguments not considered by the [circuit] court" in affirming the Rule 32 judgment. *See* doc. 31 at 41-42. This contention does not address, however, the ACCA's procedural decision to exclude Sneed's new allegation about the study on remorse in capital cases. Under these circumstances, the scope of state-barred procedural default precludes this court's consideration of Sneed's allegation about the specific study on remorse. But the other newer facts which Sneed argued in his collateral brief are before this court because the ACCA considered them without raising a procedural concern.

*ii.*

Turning to the merits-based reasoning on collateral review, the circuit court rejected this subclaim as pled inadequately,[48] and the ACCA affirmed. Doc. 26-19 at 101, 103. In reviewing the adequacy of Sneed's allegations, the ACCA determined that Sneed's sources of remorse (the Maier Report; the 1995 PSR; and testimony from Decatur Police Lieutenant Dwight Hale, his friends, and himself, doc. 26-15 at 187 ¶ 228) were insufficient to show "that counsel could have presented evidence that he was remorseful." Doc. 26-19 at 101. According to the ACCA, Sneed should have specified "what" specifically in the Maier Report and the 1995 PSR "indicated that he was remorseful." Doc. 26-19 at 102. The ACCA noted also that Sneed had "failed to plead what testimony he, his friends, or Lieutenant Hale would have provided that would have indicated that he was remorseful." *Id.*

The ACCA determined also that Sneed had failed to substantiate *Strickland* prejudice with specific studies supporting his contention that genuine remorse matters to juries. *Id.* Because of that omission, the ACCA concluded that Sneed's description of *Strickland* prejudice amounted to a "bare assertion that had the evidence of his remorse been presented, more jurors would have voted for a non-

---

[48] *See* doc. 26-16 at 161 (concluding that Sneed had failed to "plead[] specific facts indicating how he was prejudiced" by establishing how "the presentation . . . of the alleged evidence of his remorse" would have created a reasonable probability of a different sentencing outcome).

death sentence." Doc. 26-19 at 102-03. To plead prejudice adequately, the ACCA indicated that Sneed should have "allege[d] how evidence of [his] remorse would have altered the balance of mitigating circumstances and aggravating circumstances." *Id.* at 103. As another example, the ACCA added that Sneed should have "allege[d] how evidence of [his] remorse would have moved more jurors to recommend a sentence of life . . . or the judge to" accept a recommended life sentence. *Id.* The ACCA did not analyze *Strickland*'s deficient performance component.

### *iii.*

Against this backdrop, the court addresses the merits of this subclaim. As *Daniel* instructs, the court considers first Sneed's allegations setting aside any deference owed under AEDPA.

Turning to deficient performance, most of Sneed's alleged sources of remorse lack the requisite specificity to meet the heightened pleading standard on habeas review. With the exception of the Maier Report, Sneed contends only generally that trial counsel could have introduced evidence of his remorse. However, Sneed failed to summarize the nature of that anticipated evidence or testimony. Additionally, as shown below, the state court record and Sneed's own arguments undermine his reliance upon several categories of his alleged remorse.

*(a)*

In supporting this *Strickland* subclaim, Sneed argues that trial counsel performed unreasonably by failing to ask Lt. Hale about Sneed's remorse even though Lt. Hale covered that subject on direct examination. Doc. 1 at 75 ¶ 121. Specifically, Lt. Hale testified in the guilt phase that when he showed the video tape of the murder, Sneed "dropped his head and immediately started to say, 'I'm sorry, I'm sorry, I'm sorry.'" Doc. 26-6 at 127-28. And in response to Lt. Hale's question, "'Well, is that you and Hardy?'" in the video, Sneed answered, "'Yeah, that is us, but I didn't shoot anybody. I'm sorry, I'm sorry, I'm sorry.'" *Id.* at 128.

Sneed does not allege with specificity what more trial counsel could have done on cross examination in light of Lt. Hale's favorable testimony about Sneed's remorse. Likewise, Sneed has not cited any on-point authority which establishes unreasonable trial counsel error for failing to develop a witness's topical testimony, where, as here, the witness testified about that same subject at trial.

Also related to Lt. Hale's testimony, Sneed contends that trial counsel referred to Sneed's remorse "erroneously" in closing. Doc. 1 at 72 ¶ 116; *see also* doc. 26-8 at 139 ("And lastly but not least, [Sneed] had expressed remorse. Not some, but has expressed remorse."). Allegedly, counsel's mistake enabled the prosecutor "to strengthen the State's penalty phase case by highlighting the absence of remorse

119

evidence," including testimony directly from Sneed. Doc. 1 at 72 ¶ 116. But trial counsel did not argue that Sneed had testified about his remorse at trial. Doc. 26-8 at 139. Consequently, trial counsel's comments in closing were not erroneous but rather consistent with Lt. Hale's guilt-phase testimony about Sneed's remorse. Thus, Sneed falls short of establishing deficient performance with the remorse testimony from Lt. Hale.

*(b)*

Sneed alleges that unnamed "friends" could have provided testimony about his remorse. Doc. 1 at 73 ¶ 117 (internal quotation marks omitted). For the most part, Sneed fails to identify those lay witnesses' names and their expected testimony with any specificity. Doc. 1 at 73 ¶ 117; *see also* doc. 26-15 at 187-88 ¶¶ 226-29. Those key factual omissions are fatal under § 2254's heightened pleading standard.

One exception is Sneed's identification of Chuckie Reed. Doc. 1 at 74 ¶ 120. Referring to allegations made in the Rule 32 petition, in a section unrelated to the remorse subclaim, Sneed contends that he saw Mr. Reed after the crime. *Id.*; *compare* doc. 26-15 at 151 ¶ 96, *with id.* at 187-88 ¶¶ 226-29. Mr. Reed recalled that Sneed "seemed 'different and clearly devastated'" during the encounter. Doc. 1 at 74 ¶ 120. Allegedly appearing to be different post-offense as observed by a lay witness is not the equivalent of expressing remorse or regret over the victim's death. Thus, Mr.

Reed's anticipated testimony does not show that trial counsel unreasonably failed to call him as a witness available to speak of Sneed's remorse.

Alternatively, unexhausted procedural default precludes the court from considering the allegations about Mr. Reed's anticipated testimony. Specifically, Sneed did not fairly present this possible deficient performance issue—through an incorporation of allegations or otherwise—to the state courts. And Respondent has not waived—through counsel—the exhaustion requirement on this subclaim in his answer or brief. Doc. 23 at 23-26 ¶ 26; Doc. 24 at 55-59; *see also* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). Thus, Sneed's reference to "friends" does not support *Strickland*'s deficient performance prong sufficiently on habeas review.

### (c)

Sneed asserts also that he "would . . . have provided [testimony on remorse], had he been questioned about that subject on the witness stand by counsel." Doc. 1 at 73 ¶ 117. Again, Sneed has not summarized what specific testimony he would have provided. Regardless, Sneed's willingness to provide testimony about his remorse— alone—does not establish the absence of a strategic reason by counsel. After all, trial counsel could have decided that Lt. Hale's testimony proved sufficient to support

121

Sneed's mitigating remorse and even preferable to what the jury might construe as self-serving testimony from Sneed. Thus, Sneed's willingness to provide undescribed testimony of his remorse is inadequate to establish trial counsel's deficient performance for lack of specificity and a potential and reasonable strategic purpose in light of Lt. Hale's more neutral remorse testimony.

### *(d)*

Sneed contends also that the Maier Report would have provided documentary evidence of his remorse. Doc. 1 at 73 ¶ 117. The court discussed the Maier Report in subclaim B.6 and noted that it is not a part of the habeas record. But regardless of that omission, Sneed has the burden to plead what anticipated information within the Maier Report would have been available for trial counsel to introduce on remorse. In that regard, Sneed cites the description of the contents, which corresponds with a different subclaim in his Rule 32 petition, to allege what Dr. Maier reported on remorse in 1994. *Compare* doc. 1 at 73-74 ¶ 118, *with* doc. 26-15 at 188-89 ¶ 232, *and* Doc. 26-15 at 187 ¶¶ 226-29. In particular, Sneed identifies the portions of the report stating that he "was exhibiting . . . remorse over what he claims to have done" and "admitt[ed] to some feelings of remorse and depression." Doc. 1 at 73-74 ¶ 118 (internal quotation marks omitted).

122

But, on collateral review, Sneed did not incorporate the allegations about the contents of the Maier Report by reference into his remorse subclaim. Doc. 26-15 at 187 ¶¶ 226-29. Thus, Sneed did not fairly present the Maier portion of his remorse subclaim to the state courts. And, as explained above, Respondent has not waived the exhaustion requirement on this subclaim. Doc. 23 at 23-26 ¶ 26; Doc. 24 at 55-59. Consequently, unexhausted procedural default precludes Sneed from relying upon the contents of the Maier Report to meet the heightened pleading standard on his remorse subclaim.

Alternatively, from a deficient performance standpoint, Sneed has not alleged why trial counsel's failure to introduce the Maier Report could not have been a strategic decision. Specifically, much of what Dr. Maier noted—beyond remorse— might have proved detrimental to Sneed's mitigation case. For example, counsel may have concluded that "exhibiting" remorse is not the equivalent of expressing remorse such as, the testimony by Lt. Hale that Sneed said, "I'm sorry, I'm sorry, I'm sorry." Also, counsel may have concluded that Sneed's reported admission of "some remorse" would invite the court and the jury to query why he did not express "feelings of [complete] remorse" over Mr. Terry's murder. Ultimately, without allegations about the entire contents of the Maier Report in the record, Sneed has not alleged enough to overcome the presumption that trial counsel performed reasonably with

respect to that document. *Cf. Dunn v. Reeves*, 594 U.S. __, 141 S. Ct. 2405, 2413 (2021) (per curiam) (recognizing that "a silent record cannot discharge a prisoner's burden" to overcome the presumption that counsel performed reasonably). Thus, Sneed's reliance on excerpts from the Maier Report—if unexhausted procedural default does not apply here—are insufficient to show that trial counsel performed unreasonably in not introducing that document in the penalty phase.

*(e)*

The last source of remorse which Sneed identifies is the 1995 PSR. Doc. 1 at 73 ¶ 117. Again, Sneed has not summarized what specific language supports his remorse subclaim. *Id.* Consequently, unexhausted procedural default bars habeas relief due to Sneed's failure to fairly present to the Alabama courts what specifically in the 1995 PSR supported his remorse. With that omission, Sneed fails also to meet § 2254's heightened pleading standard applicable in this court.

Alternatively, based on the court's review of the 1995 PSR, doc. 27-23 at 24-31, the closest reference to remorse it contains is Sneed's account that "It was not supposed to be any shooting. We went in and John started shooting," doc. 27-23 at 26. Again, Lt. Hale's testimony about Sneed's "I'm sorry, I'm sorry, I'm sorry" comments is stronger than the ambiguous reference in the 1995 PSR. Also, Sneed fails to address that other parts of the 1995 PSR contain information that trial counsel

124

understandably did not want to interject into the penalty phase, such as Sneed's record of arrests and inability "to provide child support." Doc. 27-23 at 27-28. Consequently, Sneed has not alleged adequately how trial counsel performed deficiently.

Because of Sneed's first prong failing, ending the *Strickland* analysis here is appropriate under *Daniel*. Likewise, Sneed's remorse allegations are not subject to a cumulative prejudice assessment under *Strickland*.

## g.

In subclaim B.1, Sneed asserts that because trial counsel ended the mitigation investigation prematurely—over two years before trial—counsel failed to interview several lay witnesses—"the mothers of [Sneed's] three children, many other friends . . . , [and] [childhood] neighbors"—who were available to testify about mitigation in the penalty phase. Doc. 1 at 43-44 ¶¶ 63-64 (internal quotation marks omitted). Sneed's description of the testimony that these specific lay witnesses could have provided fall generally into one of four categories: his good character and gentle nature; difficult childhood; role as a father; and gullibility and willingness to please others.

The Rule 32 court and the ACCA denied Sneed's collateral allegations that trial counsel had cut short their mitigation investigation unreasonably or caused prejudice because of any omitted mitigating evidence. Doc. 26-16 at 150-53; Doc.

125

26-19 at 93-97. Consistent with the *Daniel* framework, the court considers first whether Sneed has stated enough to support an ineffective mitigation investigation claim. The court begins with an examination of *Wiggins*, an AEDPA decision which Sneed argues supports the adequacy of this subclaim's allegations. Doc. 1 at 45 ¶ 65.

### *i.*

The petitioner in *Wiggins* "argue[d] that his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth Amendment right to counsel." 539 U.S. at 514. The Supreme Court agreed. 539 U.S. at 534, 538. Analyzing the constitutional merits of deficient performance first, the Supreme Court found that "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and failed to follow up on mitigating leads "actually discovered in [some of the petitioner's] records." 539 U.S. at 524-25; *see id.* at 525 (agreeing with the district court's assessment that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background"). The Court determined that the record from the sentencing hearing, which reflected "a halfhearted mitigation case," was at odds with "the

'strategic decision' the state court[] . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence." *Id.* at 526.

The Court faulted the state court for assuming that trial counsel's possession of "*some* information with respect to the petitioner's background" was sufficient to show that they made "a tactical choice not to present a mitigation defense." *Id.* at 527 (emphasis in original). The Court observed instead that the evaluation of an investigation under *Strickland* includes "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* The Court added that even accepting that trial counsel had "limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Id.* The Court identified "the reasonableness of the investigation [offered] to support that strategy" as a mandatory part of the deficient performance assessment. *Id.*

After the constitutional analysis, the *Wiggins* Court concluded that the state court had unreasonably applied *Strickland*'s deficient performance prong. The Court found AEDPA legal error because despite agreeing with the petitioner that the "failure to prepare a social history 'did not meet the minimum standards of the profession,'" the state court stopped the *Strickland* analysis prematurely. 539 U.S. at

527 (quoting state court opinion). Specifically, the state court "did not conduct an assessment of whether the decision to cease all investigation upon obtaining the [presentence investigation and social services] records actually demonstrated reasonable professional judgment." *Id.* The Court observed that "[t]he state court merely assumed that the investigation was adequate" even though trial counsel's "abandonment [of] their investigation at an unreasonable juncture[] ma[de] a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. The Court found also that the state court unreasonably "defer[red] to counsel's strategic decision not 'to present every conceivable mitigation defense,' . . . [because] counsel based this alleged choice on . . . an unreasonable investigation." *Id.* at 528 (quoting state court opinion).

In assessing deficient performance, the Court flagged a "clearly erroneous" state court assumption under § 2254(d)(2) and (e)(1) regarding the contents of the social services records. *Wiggins*, 539 U.S. at 528-29. The Court explained that "[t]his partial reliance on an erroneous factual finding further highlight[ed] the unreasonableness of the state court's decision." *Id.*

### ii.

With this *Wiggins* summary in mind, the court evaluates Sneed's overriding allegation that trial counsel ended the mitigation investigation of lay witnesses

unreasonably. Unlike the deficient performance assessments in subclaims B.3, B.4, and B.5, preliminarily Sneed has stated enough for this court to consider each category of omitted lay witness testimony in more detail.

Among other facts, Sneed alleges that trial counsel had "a full two and a half years before the 2006 trial" to investigate lay witnesses beyond the "preliminary [family] interviews," which Mr. Johnston had conducted in April 2003. Doc. 1 at 44 ¶ 64 (internal quotation marks omitted). According to Sneed, with the exception of some prison guards, trial counsel did not interview any other lay witnesses, over that pretrial time period. *Id.* Sneed argues that in curtailing the investigation of additional lay witnesses prematurely, trial counsel never learned about the "powerful mitigating evidence that could have been presented to the court and jury in the sentencing phase," *id.* (internal quotation marks omitted), and that "cutting short a mitigation investigation in a capital case in this unreasonable way" is at odds with *Wiggins*, doc. 1 at 45 ¶ 65. Finally, Sneed relies also upon the Guidelines' reference to "interview[ing] friends, co-workers, acquaintances, and associates" as "fundamental . . . [to] a capital mitigation investigation." *Id.* at 43-44 ¶ 64 (internal quotation marks omitted).

*iii.*

Without factoring in AEDPA deference preliminarily—as *Daniel* instructs—Sneed has the stronger deficient performance position. Thus, Sneed's deficient performance allegations about trial counsel's lay witness investigation are sufficient to trigger a deeper examination of the remainder of subclaim B.1. Therefore, the court must consider the impact of AEDPA and decide whether the Alabama courts' merits-based rejection of Sneed's deficient performance allegations deserve deference.

The Rule 32 court noted that "abundant documentation" reflected Sneed's trial counsel's mitigation efforts "after the 2003 calendar year." Doc. 26-16 at 150. The Rule 32 court observed too that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence." Doc. 26-16 at 150 (internal quotation marks omitted) (quoting *Wiggins*, 539 U.S. at 533).

For its part, the ACCA pointed to specific examples of trial counsel's mitigation efforts contained in the record which occurred closer to trial. Doc. 26-16 at 94. This included trial counsel's hiring of Ms. Terrell as a mitigation expert in 2004. The ACCA noted that later that year, Ms. Terrell "provided counsel with a comprehensive report detailing the interviews with Sneed's family and the mitigation she discovered." *Id.* After Ms. Terrell submitted her report, the ACCA pointed out that trial counsel retained Dr. Rosenzweig for "possible [additional] mitigation." *Id.*

130

The ACCA added that in 2006, trial counsel "received funds to go to Louisville, Kentucky to investigate mitigation." *Id.* Given these investigative activities, the ACCA determined that the circuit court had not erred in the finding that the record refuted Sneed's claim that trial counsel stopped investigating mitigation over two years before trial.

Missing from both state courts' analyses was Sneed's point that trial counsel had stopped investigating potential lay witnesses prematurely. As Sneed argues in reply, "[r]ather than focus on the claim asserted, the [ACCA] reformulated the claim and discussed trial counsel's other mitigation activities during the same [time] period." Doc. 31 at 33. Under these circumstances, the court agrees with Sneed that the ACCA's reliance upon the state record to refute allegations materially different from what he alleged collaterally is due no deference legally or factually under § 2254(d)(1), (d)(2), (e)(1).

*iv.*

The court must next consider the sufficiency of Sneed's underlying allegations about the additional mitigating evidence that trial counsel failed to discover because of a purportedly unreasonable lay witness investigation. In particular, in subclaim B.1, Sneed identifies eight lay witnesses by name, confirms their willingness to testify on his behalf, and summarizes their anticipated testimony. Doc. 1 at 44-49 ¶¶

64, 66-72, 74. The omitted mitigating evidence includes Sneed's reputation "among . . . friends and acquaintances" as "an endearing figure" and "a gentle giant;" his lack of aggression and unwillingness to hurt others "unprovoked," including strangers; his slowness to catch on and inability to think about the consequences of his actions; his gullibility and tendency to follow others; his desire to be loved; his impoverished and "isolat[ed]" childhood, including lack of food; his mother's depression and illnesses; his efforts to be a good father and love for his three children; and his lack of gun ownership or experience. Doc. 1 at 44-49 ¶¶ 64, 66-72 (internal quotation marks omitted).

Sneed's collateral allegations about trial counsel's unreasonable failure to discover this mitigating information from lay witnesses are comparable to subclaim B.1. *See generally* doc. 26-15 at 147-65 ¶¶ 93-145. In denying this part of Sneed's Rule 32 petition, the circuit court did not address the sufficiency of his allegations about deficient performance. Doc. 26-16 at 151-53. Instead, the circuit court focused on the adequacy of Sneed's allegations of prejudice. Doc. 26-16 at 151-53. Referencing Rules 32.3, 32.6(b), and 32.7, the circuit court found that Sneed's *Strickland* allegations failed under the second prong. Doc. 26-16 at 151-53. The circuit court did not analyze the prejudicial impact collectively but rather within categories of evidence. Doc. 26-16 at 151-53.

The ACCA affirmed the circuit court's Rule 32 judgment. Doc. 26-19 at 95. For most of the allegations, the ACCA focused on prejudice. Doc. 26-19 at 94-97. The ACCA rejected Sneed's allegations "that he was a desperate, gullible follower seeking acceptance and friends and that he was immature for his age as a child" for insufficient pleading of prejudice. Doc. 26-19 at 95. The ACCA described Sneed's allegations of prejudice as "bare." *Id.* (internal quotation marks omitted).

Regarding Sneed's allegations that he "was a gentle giant, who could not be convinced to hurt others;" "was always concerned with the well[-]being of others;" and "was inexperienced with guns or violence," the ACCA pointed out that the prosecutor and trial counsel had reached an agreement about such good-character evidence. *Id.* at 95-96 (internal quotation marks omitted). Specifically, the ACCA explained that Sneed had failed to show prejudice because trial counsel's presentation of good-character evidence would have opened the door to the prosecutor's introduction of the disciplinary reports Sneed had received in prison. *Id.* at 96; *see also* doc. 26-2 at 23-193 (collecting Sneed's incident reports and disciplinary records).

The ACCA rejected Sneed's allegations "that he was a good, caring father" as "refuted by the record." *Id.* Here, the ACCA referred to Ms. Terrell's mitigation report, which summarized that Sneed had "ha[d] [no] contact with [his] twin[]

[daughters] in years" and had received a letter from his older daughter in 2004. *Id.* (internal quotation marks omitted). The ACCA concluded that because "trial counsel did investigate Sneed's relationship with his children," a summary denial was proper. *Id.*

The circuit court did not address Sneed's allegations about his traumatic childhood. Doc. 26-16 at 151-53. In introducing the subclaim, the ACCA mentioned Sneed's allegations within this category, doc. 26-19 at 93, but did not revisit that area in its analysis, *id.* at 95-96.

***v.***

Against this backdrop, the court moves to the habeas analysis. The court disposes of the good character and role as a father categories of undiscovered lay witness testimony quickly. The court dives deeper on the third and fourth categories—new mitigating allegations of Sneed's difficult childhood and his gullible nature.

***(a)***

Sneed cannot prevail on the good character category because if any prejudice resulted from trial counsel's omission of good character evidence, that amount is negligible. As the ACCA pointed out, the introduction of evidence of Sneed's good character would have allowed the prosecutor to introduce competing prisoner

disciplinary reports under the parties' pretrial agreement. And with respect to Sneed's cumulative error contention, adding a negligible amount of prejudice to his prior sentencing picture of aggravators and mitigators is insufficient to create a reasonable probability of a life sentence if trial counsel had introduced good character evidence.

Even accepting that this court has made an incorrect assessment of Sneed's ability to show prejudice with his allegations of good character evidence, habeas relief is still inappropriate under AEDPA. Specifically, Sneed has not shown an unreasonable legal or factual error on the part of the ACCA. For example, Sneed has not demonstrated—with Supreme Court precedent—that the ACCA reached an unreasonable conclusion that he had not alleged adequate prejudice because his competing prisoner disciplinary reports would negate the mitigating value of any good character evidence. *See Raheem v. GDCP Warden*, 995 F.3d 895, 932 (11th Cir. 2021) (explaining that a state-court determination "could not have been contrary to or an unreasonable application of clearly established law" when "no Supreme Court case was on point"), *cert. denied sub nom. Raheem v. Ford*, 142 S. Ct. 1234 (2022). Sneed has not demonstrated either that the ACCA committed clearly established error under the *Strickland* cumulative prejudice framework. Instead, fair-minded jurists could reasonably disagree whether opening the door to the evidence of Sneed's bad character would cancel out any appreciable mitigating value of his alleged good

character evidence. And factually, Sneed does not dispute the existence of the character evidence agreement with the State or his prisoner disciplinary reports under § 2254(d)(2). Thus, habeas relief is inappropriate based upon the first category.

### *(b)*

Moving to the second category, the record—in particular Ms. Terrell's investigation—refutes Sneed's allegations that trial counsel failed to investigate his relationships with his children. *See* doc. 26-19 at 96-97 (describing the limited contact between Sneed and his three girls). And nothing in Ms. Terrell's notes about Sneed's children suggests that trial counsel ended the investigation of that topic unreasonably or prematurely. Thus, these investigative allegations are inadequate under *Strickland*'s first prong. Alternatively, Sneed has not demonstrated that the ACCA reached an unreasonable decision that he could not establish ineffective assistance given Ms. Terrell's mitigation report. Accordingly, AEDPA deference provides a secondary basis for denying these allegations in the second category.

### *(c)*

Any omitted allegations of Sneed's difficult childhood from lay witnesses would be cumulative to the expert witnesses' testimony on that same subject.[49] The

---

[49]AEDPA deference does not apply to the third category because the state courts did not address those allegations on the merits.

court recognizes that the cumulative nature of evidence alone does not mean that its omission cannot show *Strickland* prejudice. Additionally, lay witness mitigating testimony may strengthen an expert witness's testimony on the same topic. Still, on this record, Sneed's allegations of prejudice tied to his childhood are inadequate as reflected in the sentencing order. As mentioned in the background section, the circuit court gave Sneed the benefit of that non-statutory mitigating factor. Doc. 1 at 138. But in the overall weighing, the sentencing court "d[id] not attribute [Sneed]'s unfortunate upbringing and experiences as excuses . . . or explanations for his total lack of regard for the life of Mr. Terry." *Id.* at 140. Thus, because of the sentencing court's reasoning contained in the override decision, Sneed's allegations that additional testimony about his difficult childhood from lay witnesses are inadequate to create a reasonable probability of a different sentencing outcome.

### *(d)*

The court turns to the fourth category of omitted lay testimony—allegations of Sneed's gullibility and tendency to follow others, i.e., the anticipated testimony of one of his childhood friends, Keith "Toby" Jennings, and Mr. Jennings' sister, Lynetta Jennings. Doc. 1 at 45-46 ¶¶ 66-67. As to Mr. Jennings, the omitted testimony included that Sneed "was incapable of forming plans to rob or kill; had always been afraid of prison and . . . tried to avoid being involved in a serious crime[;] was gullible

and tended to follow others[;]" and that "it was totally out of character and unthinkable for . . . Sneed to intentionally engage in the violent use of bodily harm against a mere stranger (like a store clerk), in that . . . Sneed could never be persuaded to hurt others who had not provoked him." *Id.* at 45 ¶ 66 (internal quotation marks omitted). As for Ms. Jennings, her anticipated testimony included that Sneed "was a follower, a 'hangout dude,' who must have been told by others that the robbery in Decatur would be very easy (like saying they had done it before), and that 'Charles [Sneed] just went along,' never dreaming someone would be killed." *Id.* ¶ 67 (internal quotation marks omitted).

The circuit court summarily dismissed this category for inadequate pleading, finding that Sneed's lay-witness allegations "that he was desperate for attention and a gullible follower" as a child were inadequate to show prejudice. Doc. 26-16 at 151. The ACCA affirmed, explaining that the allegations that Sneed "was a desperate, gullible follower seeking acceptance and friends and that he was immature for his age as a child" lacked facts "that would establish a reasonable probability" of a different sentencing outcome. Doc. 26-19 at 95. The ACCA continued that Sneed had offered "bare allegation[s] that prejudice had occurred without specific facts indicating how [he] was prejudiced." *Id.* (internal quotation marks omitted) (quoting *Hyde v. State*, 950 So. 2d 344, 356 (Ala. Crim. App. 2006)).

In this court's assessment—following the *Daniel* framework—some of the allegations of the omitted testimony tied to Sneed's gullibility would open the door to the introduction of his disciplinary incidents as a prisoner. Consequently, for the same reasons discussed in the first category above, the court concludes that those parts of Sneed's gullible allegations are inadequate to show any appreciable prejudice or contribute to Sneed's claim of a cumulative *Strickland* prejudice error.

For those follower allegations more removed from Sneed's character, the court concludes that he has not provided enough detail to establish *Strickland* prejudice. Specifically, this court cannot tell from Sneed's allegations whether the impressions which Mr. and Ms. Jennings expressed about his gullibility pertained to when he was growing up in Kentucky or closer to the time of the capital offense when he was twenty-three years old. Without that temporal clarification, the court can only speculate about the potential mitigating value of the remaining alleged testimony from those omitted witnesses. Consequently, Sneed has not met the heightened pleading requirement on his allegations of *Strickland* prejudice.

And accepting that this court has made an incorrect prejudice assessment of this last category, Sneed has not demonstrated that the ACCA reached an unreasonable decision that his allegations of prejudice were too "bare" to create a

reasonable probability of a different sentencing outcome. Accordingly, AEDPA deference provides an alternative basis for denying these allegations.

### h.

As a final matter in this penalty-phase *Strickland* section, the court addresses the collective impact of prejudice under subclaim B.1.[50] Accepting that the alleged lay witness testimony would strengthen Sneed's penalty-phase presentation, the new mitigation when compared to the old mitigation (and unaffected aggravation) does not "paint[] a vastly different picture" of the sentencing circumstances. *Williams*, 542 F.3d at 1342; *cf. Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("The prison files pictured [the petitioner]'s childhood and mental health very differently from anything defense counsel had seen or heard.").

Likewise, the cumulative impact of trial counsel's allegedly unreasonable penalty-phase errors in this subclaim are insufficient to create a reasonable probability of a different sentencing outcome given the reasoning behind the override decision.

---

[50]The Alabama courts did not address Sneed's allegations of cumulative penalty-phase error on the merits. The court does not include subclaims B.2-B.6 or Sneed's relationships with his children under B.1 in this alternative analysis because the allegations in those claims are insufficient to support habeas relief under *Strickland*'s first prong or procedurally defaulted.

Accordingly, the court denies Claim B for these multiple reasons.[51]

## IV.

After applying AEDPA, de novo review, or principles of procedural default, Sneed has not shown an entitlement to habeas relief based on his allegations of constitutional error in his capital conviction and sentence. Consequently, the court denies Sneed's § 2254 petition, doc. 1, and will not hold an evidentiary hearing.[52] The court will enter a separate order consistent with this memorandum opinion.

**DONE** the 31st day of August, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[51]Although to show *Strickland* pleading sufficiency Sneed cites a host of authorities, *see generally* doc. 1 at 29-32, 45, 50, 53 & n. 7, 55-56, 58 n. 8, 62, 64-66, 70-72, 75, 80-82 ¶¶ 45-51, 65, 78, 82-86, 91, 97, 102-04, 106, 112, 115, 122, 131-34; doc. 31 at 52-54, 56-59, 62-63, 67, 70-74 & n. 27, 78-81, 86-89, 91-92, 94 n. 32, 99-104, those cases are too dissimilar factually or procedurally to salvage his penalty-phase allegations on this record.

[52]*See Martinez v. Sec'y, Fla. Dep't of Corr.*, 684 F. App'x 915, 926 (11th Cir. 2017) ("[T]he district court need not conduct an evidentiary hearing if the record refutes the petitioner's factual allegations, otherwise prevents habeas relief, or conclusively demonstrates that the petitioner was not denied effective assistance of counsel." (citing *Schriro*, 550 U.S. at 474)); *see also Cullen*, 563 U.S. at 182 ("Limiting § 2254(d)(1) review to the state-court record is consistent with [Supreme Court] precedents interpreting that statutory provision.").